## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NERIUM SKINCARE, INC. on behalf of itself and in a derivative capacity for Nerium International, LLC, and NERIUM BIOTECHNOLOGY, INC.<br><br>        Plaintiffs,<br>v.<br><br>JEFF A. OLSON,<br>NERIUM INTERNATIONAL, LLC,<br>and JO PRODUCTS LLC,<br><br>        Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br><br><br>Civil Action No. 3:16-cv-1217-B |

## PLAINTIFFS' SECOND AMENDED COMPLAINT AND APPLICATIONS FOR PRELIMINARY AND PERMANENT INJUNCTIONS AND RECORD INSPECTION

Plaintiffs Nerium SkinCare, Inc. (on behalf of itself and derivatively on behalf of Nerium International, LLC) and Nerium Biotechnology, Inc. (collectively, "Nerium") file this Second Amended Complaint and Applications for Preliminary and Permanent Injunctions and to Compel Record Inspection against Jeff A. Olson ("Olson"), Nerium International, LLC ("NI" or "the Company"), and JO Products, LLC ("JO Products") (collectively, "Defendants").

## INTRODUCTION

1.      Plaintiffs seek to end their partnership with a man who, while posing as the exclusive distributor of their groundbreaking NERIUM skin-care products, developed a competitive knockoff that he now sells under the same NERIUM trademarks.  Even worse, this "partner" has used the parties' shared distribution business as a personal piggy bank while pocketing more than $60 million—depriving Plaintiffs of the fruit of their hard work and threatening their cancer research activities.

2.      Plaintiffs Nerium Biotechnology and its subsidiary Nerium SkinCare are scientific research and development companies focused on the unique anti-cancer, anti-viral, immune-stimulating and dermal health benefits of the *Nerium oleander* plant.  While studying the plant's ability to combat skin cancer, Nerium observed that it also had remarkable age-defying effects when used topically, and saw the potential for a consumer product that could fund its research.  After years of study, hard work, and millions of dollars in investment, Nerium developed its breakthrough age-defying skin cream containing *Nerium oleander* extracts.  This product was ready for sale to consumers in 2010.

3.      That is when Nerium met Jeff Olson, an acquaintance of a Nerium shareholder. Olson, who had a background in multi-level marketing, seemed enthusiastic about the Nerium product and shared Nerium's belief in its huge potential.  He convinced Nerium to partner with and entrust him with "marketing" Nerium's products.

4.      Nerium and Olson formed a new company called Nerium International, LLC ("NI" or the "Company") to distribute Nerium products, with Olson as the sole manager. Nerium SkinCare owns 30% of NI.  Olson's wholly owned entity, JO Products, owns the other 70%.  Under the Company Agreement, NI must buy products exclusively from Nerium at modest prices sufficient to fund Nerium's research.  The bigger return on Nerium's investment would come from its equity stake in the Company, plus bonus payments it would receive when NI reached certain sales milestones.  The Company Agreement also makes clear that Nerium owns all NERIUM trademarks and that NI requires a license to use them in connection with the marketing, distribution, and sale of Nerium products.  The Company Agreement contemplates no license for non-Nerium products.

2

5.     Right after NI opened its doors, sales of Nerium products took off.  But as sales rose and began triggering bonus payments, Olson did not allow Nerium to receive any of the fruit.  Instead, Olson found creative ways to put more in his own pocket at Nerium's expense. For example, for the nine months ending September 30, 2015, NI managed to allocate $8 million in profits to JO (Olson) while allocating a $985k *loss* to Nerium SkinCare, his 30% partner—a bizarre result without explanation.  As another example, NI recorded $450 million in revenue for year ending December 31, 2015, but only $333,559 in profit.  As detailed below, Nerium has significant reason to believe that much of the balance disappeared into the hands of Olson, his relatives, and his associates through sham transactions and hidden payments.

6.     Olson also set out to take Nerium's intellectual property and goodwill, quietly diverting Nerium resources (through NI) to develop a knockoff skin-care product called Optimera that would compete against Nerium's products using the NERIUM trademarks.  The knockoff contained no extracts of the *Nerium oleander* plant, though the branding and packaging would lead consumers to believe the opposite.  Olson's motive was simple: he had a personal financial interest in the knockoff, so this would put more money in his pocket.

7.     Nerium was surprised to learn about Olson's knockoff plans, not from him, but from one of the suppliers that Olson solicited for the knockoff.  When confronted, Olson hastily explained that the knockoff was only a "placeholder" to be sold in international markets until Nerium obtained regulatory approval in those markets.  Regrettably, Nerium believed him. Olson did not explain why he had chosen to develop the knockoff product behind Nerium's back instead of asking Nerium to develop it with him.

8.     Olson is a salesman.  For the last two years, has managed to string Nerium along with empty promises to "work together" and "resolve" misunderstandings.  But his repeated

3

assurance that he would sell Nerium products in foreign markets after they received regulatory approval has proven to be false.  Nerium products are now fully approved, yet Olson will not sell them.  He is intent on selling Optimera and other knockoffs under the NERIUM trademarks because that means more money for him.

9.      The situation has grown urgent.  Olson's relentless expansion of his knockoff products is irreparably harming the goodwill behind the NERIUM trademarks.  And as he pivots the business away from Nerium and toward his knockoff, he causes NI to purchase less and less product from Nerium, while continuing to withhold the equity, thus cutting off both of Nerium's financial legs.

10.     Plaintiffs request preliminary and permanent injunctions to prevent the sale of Olson's knockoffs under the NERIUM marks, a declaration of Olson's obligations under the Company Agreement, damages for his financial abuses and mismanagement, and termination of the partnership so the parties can go their separate ways.

**THE PARTIES**

11.     Plaintiff Nerium SkinCare, Inc. is a corporation organized under the laws of the state of Texas and is a member of Nerium International, LLC. Nerium SkinCare asserts claims both in its own capacity and in a derivative capacity on behalf of the Company. Under Section 101.463(c) of the Texas Business Organizations Code, because the Company is closely held and because Nerium SkinCare is a substantial minority member, justice requires that the derivative action be treated as a direct action brought by the member for the member's benefit.

12.     Plaintiff Nerium Biotechnology, Inc. is a Canadian corporation doing business in the United States.  Nerium Biotech's primary place of business is located at 11467 Huebner Road, Suite 175, San Antonio, Texas 78230.

4

13.     Jeff Olson is an individual who resides in Denton County.  Olson has been previously served with process and appeared in this action.

14.     Nerium International, LLC is a Texas limited liability company.  NI's primary place of business is located at 4004 Belt Line Road, Suite 112, Addison, Texas 75001.  NI has been previously served with process and appeared in this action.

15.     Defendant JO Products, L.L.C. is a limited liability company existing under the laws of the state of Texas. It has been previously served with process and appeared in this action.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over Nerium Biotech's claims under 28 U.S.C. §§ 1331 and 1338(a) and 28 U.S.C. § 2201, *et seq.*, and supplemental jurisdiction over the remaining claims under 28 U.S.C. §§ 1338(b) and 1367(a).

17.     This Court has personal jurisdiction over Olson.  Olson has already appeared and submitted to the jurisdiction of the 161st Judicial District Court, Dallas County, Texas in this action before removal.

18.     This Court has personal jurisdiction over NI because NI is a resident of Texas and regularly transacts business in the District.  NI has already appeared and submitted to the jurisdiction of the 161st Judicial District Court, Dallas County, Texas in this action before removal.

19.     This Court has personal jurisdiction over JO Products as it is a resident of Texas and regularly transacts business in the District.  JO Products has already appeared and submitted to the jurisdiction of the 161st Judicial District Court, Dallas County, Texas in this action before removal.

5

20.    Venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendants are subject to personal jurisdiction in this District.

## THE FACTS

### The History of Nerium

21.    Nerium Biotech is a research and development company dedicated to science-based product development.  Together with leading medical institutions, Nerium Biotech has focused its research and product development on the anti-cancer, anti-viral, and dermal properties of natural botanical compounds.

22.    During its research, Nerium Biotech discovered that the *Nerium oleander* plant has significant anti-aging properties when applied to the skin. Using a patented technology, Nerium Biotech isolated the beneficial properties of the plant and created an extract called NAE-8®.

23.    To facilitate the development and manufacture of products containing NAE-8®, Nerium Biotech formed a division of the company called Nerium SkinCare. The company's vision was to develop a line of skin-care products featuring NAE-8®.  After extensive testing and research, Nerium SkinCare developed a breakthrough line of skin-care products ("the Product Line") that would go on to sell millions of units around the world.

### Nerium Develops Intellectual Property

24.    Since at least 2008, Nerium has used the NERIUM marks throughout the United States in connection with medical research and product development services, including in the fields of biotechnology, drug discovery, pharmaceuticals, scientific research, medical procedures, and drug therapies; and in skin-care and skin-related goods and products, including

6

medicated and non-medicated skin-care preparations, such as creams, lotions, gels, toners, and cleaners.  Accordingly, Nerium owns common-law trademark rights in the NERIUM Marks.

25.     For example, since at least 2008 Nerium has continuously been in the business of providing medical research and product development using the mark NERIUM BIOTECHNOLOGY, INC. in commerce.

26.     By further example, since at least as early as 2009, Nerium has continuously been using the mark NERIUM SKINCARE in commerce on or in connection with skin-care products, including non-medicated skin-care preparations. Since at least as early as 2009, Nerium has continuously been using the mark NERIUMDERM in commerce on or in connection with skin-care products, including non-medicated skin-care preparations.

27.     Since at least as early as 2009, Nerium has continuously been using the mark NERIUMCS in commerce on or in connection with skin-care products, including non-medicated skin-care preparations.

28.     Since at least as early as 2011, Nerium has continuously been using the mark NERIUMAD in commerce on or in connection with skin-care products, including non-medicated skin-care preparations.

29.     Since at least as early as 2015, Nerium has continuously been using the mark NERIUMRX in commerce on or in connection with skin-care products, including medicated skin-care preparations.

30.     Since at least as early as 2008, Nerium has labeled these products, and its services, with the NERIUM Marks, establishing common-law trademark rights.  Nerium went on to register its marks, both in the United States and in many foreign countries. The table below reflects some of the marks Nerium has registered.

7

| Mark | Date of Filing | Registration No. |
|------|----------------|------------------|
| NeriumDerm A NATURAL SKIN REPAIR CREAM | 25 January 2010 | 3921445 |
| Nerium SkinCare A DIVISION OF NERIUM BIOTECHNOLOGY, INC. | 25 January 2010 | 3921446 |
| NeriumCS A Natural Cold Sore Relief Serum | 25 January 2010 | 3921447 |
| NERIUMRX | 4 October 2010 | 4768865 |
| NERIUM SKINCARE | 4 October 2010 | 4069528 |
| NERIUMDERM | 4 October 2010 | 4069525 |
| NERIUMCS | 4 October 2010 | 4062274 |
| NERIUMAD | 12 July 2011 | 4219079 |
| Nerium BIOTECHNOLOGY, INC. | 6 August 2012 | 4464657 |
| NERIUM BIOTECHNOLOGY, INC. | 25 February 2013 | 4414257 |
| NERIUMFIRM | 30 January 2014 | 4956348 |

31.     The certificates of registration for the above U.S. federal trademark registrations are attached as **Exhibits A-1 through A-11.**  Attached as **Exhibit B** is a list of Nerium's current foreign trademark registrations for the NERIUM Marks.

8

32.     Each of these Nerium Marks is inherently distinctive.   Alternatively, the NERIUM Marks have acquired secondary meaning and have become distinctive through Nerium's substantially exclusive and continuous use and widespread and significant promotion and advertising of Nerium's goods and services under the NERIUM Marks.  Consumers in the biotechnology and skin-care industries recognize the NERIUM Marks as a source identifier for Nerium products and services, and as a symbol of Nerium's goodwill.

**The Creation of Nerium International**

33.     Having developed—and already sold—skin-care products featuring the NERIUM Marks, Nerium sought out a partner to bring the Product Line to a wider audience. Eventually, Nerium was introduced to Jeff Olson ("Olson"), an entrepreneur experienced in multi-level marketing organizations.

34.     Olson expressed enthusiasm about the potential market for Nerium products, and agreed that part of the Product Line's success would be the inclusion of Nerium's proprietary extract, NAE-8®. Olson noted that because the process for extracting NAE-8® was patented, competitors would be unable to manufacture a similar product from the *Nerium oleander* plant.

35.     The parties agreed to form a limited liability company called Nerium International, LLC ("NI"). The company would be devoted to selling the Product Line, using multi-level marketing to bring skin-care products backed with real science to a global audience. While proposing formation of the Company, Olson wrote a Letter of Intent to Nerium, detailing his proposal. In that letter, Olson explained that the Company would be responsible for marketing, advertising, promoting, distributing, and selling the Product Line. Olson further specified that the Company would not sell other products that were "counter-productive to the sale of the Product Line."

9

36.     Ultimately, to formalize this partnership, Nerium SkinCare and Olson negotiated a Company Agreement that would govern NI. The Company Agreement provided that Nerium would own 30% of NI, and that JO Products—a limited liability company owned solely by Olson[1]—would own the remaining 70%. The Company Agreement was entered into on April 6, 2011, and was retroactively effective as of October 25, 2010.

**NI's Purpose and the Importance of Exclusivity**

37.     Section 2.05 of the Company Agreement describes the purpose for which NI was formed. Echoing Olson's Letter of Intent, it states that the "primary purposes of the Company shall be the development, purchase, distribution and sale of . . . the Product Line." The same section defines the "Product Line" as "all cosmetic products and over the counter ('OTC') products that have been developed, or are in the future developed" by Nerium.

38.     To that end, Section 4.03 the Company Agreement requires Nerium to produce "sufficient quantities of the Product Line to fill all anticipated current and future demand for the Product Line," which Nerium has done.  Nerium is the manufacturer, and NI was appointed the "sole and exclusive worldwide distributor of the Product Line" (with exceptions, e.g., for over-the-counter products and certain regions).

39.     This exclusivity was designed to go both ways: Nerium would not be permitted to sell the Product Line to any other distributors, and NI would not be able to sell any products that would compete with or are "counter-productive" to the sale of the Product Line, as Olson stated in his Letter of Intent.  Accordingly, Section 6.03 of the Company Agreement prohibits Olson

---

[1] Although JO Products owns 70% of NI, Olson is also a party to the Company Agreement individually. This includes a responsibility to "jointly and severally, unconditionally and absolutely guarantee[] . . . the prompt and full performance, when due, of all obligations, warranties and covenants of JO (as such term is defined above), fixed or contingent, arising out of, or within, the Company Agreement. . . . "

10

from causing NI (or anyone else) to "produce[] or distribute[] cosmetic products which are materially similar to or competitive with the Product Line."

40.     As sole manager, moreover, Olson was required to advertise the Product Line exclusively.  The Company Agreement provides that he would be "delegated the sole authority for the organization, supervision and oversight of the marketing efforts of the Company, and in such capacity <u>shall</u> supervise and manage the Company efforts to: . . . (b) promote and advertise the <u>Product Line</u> . . . (h) plan and coordinate sales and promotional events for the Product Line on a nationwide and, as the markets for the <u>Product Line</u> expand, worldwide basis . . . ." Company Agreement § 6.13 (emphasis added).  He was not delegated authority to market similar or competing products outside the Product Line.

### Licensing Nerium's Intellectual Property

41.     To facilitate NI's distribution of the Product Line, the Company Agreement also calls for the execution of a Perpetual Distribution and Licensing Agreement (the "DLA") between the Company and Nerium SkinCare to delineate the exclusive and non-exclusive rights of Company to market the Product Line and to grant certain intellectual property rights to the Company "to the extent reasonably necessary for the marketing, distribution and sale *of the Product Line*" (emphasis added) (not other products, like Optimera).  Despite this, the Company has failed and refused to enter into the DLA, which, among other things, has frustrated the purpose of the Company Agreement and caused irreconcilable damage to the parties' relationship.

42.     Section 20.01(d)(vii) also details in what context NI would be permitted to use the Product Line's history of scientific development in advertisements. The Agreement states that Nerium's history of research and development "may be relied upon, and utilized by the

11

Company in conjunction with the distribution, marketing and sale *of the Product Line*." (emphasis added). This would not allow use of the Product Line's history to sell Optimera and other knockoffs. Indeed, that would be deceptive.

43. Under the Company Agreement, Nerium owns all NERIUM Marks used on or in connection with the skin-care products Nerium manufactures as well as the distribution thereof, including marks used in connection with any multilevel marketing, retail, and/or distribution services. For example, and without limitation, Nerium is the rightful owner of the marks identified in the following U.S. trademark applications and registrations for NERIUM Marks, which were improperly filed by NI: the N & design mark in U.S. Trademark Registration No. 4469321; the N & design mark in U.S. Trademark Registration No. 4425567; the N NERIUM INTERNATIONAL & design mark in U.S. Trademark Application Serial No. 86276118; the N NERIUM & design mark in U.S. Trademark Application Serial No. 86276158; the NERIUM mark in U.S. Trademark Application Serial No. 86276183; the THE NERIUM EXPERIENCE mark in U.S. Trademark Application Serial No. 86368419; the THE NERIUM EXPERIENCE mark in U.S. Trademark Application Serial No. 86370727; the N NERIUM & design mark in U.S. Trademark Application Serial No. 86413924; and the N NERIUM & design mark in U.S. Trademark Application Serial No. 86413976. Nerium has made these marks available for the Company's use only to promote and advertise the Product Line.

**Nerium's Two Streams of Revenue**

44. Under the Company Agreement, Nerium has two streams of revenue. The first is the profit Nerium makes from the sale of the Product Line to NI. Section 4.03 of the Company Agreement provides that NI will pay "a price determined by the result obtained from a pass-

through cost-of-goods sold basis with no overhead mark-ups, plus a profit margin of thirty percent (30%)."

45.     The greater return on Nerium's investment in research and development of Nerium products is in its equity stake in the Company.  Article V of the Company Agreement provides that profits are to be distributed to Nerium and JO Products "based upon their respective Percentage Interest." In other words, Olson and Nerium would initially split the profits made from the sale of the Product Line to the public 70%/30%. But if NI meets certain revenue thresholds, Nerium's share increases in stages up to 40%.  Art. 21.04.

46.     The terms of the Company Agreement demonstrate how much Nerium trusted Olson. As the sole Manager of NI, he would be solely responsible for selling the Product Line and ensuring that the profits were properly distributed. But Nerium would come to regret placing Olson in this position of trust.

**Nerium Develops Trade Dress for the Product Line**

47.     At least as early as 2011, Nerium Biotech introduced a line of skin-care products under the NERIUMAD brand of the NERIUM Marks, including NERIUMAD day creams, NERIUMAD night creams, and NERIUMAD body firming creams (collectively, the "NERIUMAD Products").  Nerium Biotech expended considerable resources in researching, developing, and manufacturing its NERIUMAD Products. Nerium Biotech manufactured the NERIUMAD Products through its subsidiary, Nerium SkinCare, and NI distributed the NERIUMAD Products.

48.     The following table contains images showing the overall appearance of the NERIUMAD Products:

13



| NERIUMAD night cream | NERIUMAD day cream |



NERIUMAD body firming cream

49.     The overall appearance of each of the NERIUMAD Products is the subject of trade dress protection.

50.     The unique and distinctive appearance of each of the NERIUM Products results from a combination of individual features that are shown in the pictures above, including, but not limited to:

a.     NERIUMAD night creams:  (i) the shape of the bottle, specifically, a cylindrical plastic bottle with curved sides that narrow at the center; (ii) the coloring of the bottle, which is transparent at the base, slate colored through most of the bottle body, reflective metallic or chrome-colored at the top, and contains a narrow, light-green circumferential band near the center; (iii) the color, shape, and

15

position of the leaf design near the top of the bottle; (iv) the word "FACE" printed in white lettering in the narrow, light-green circumferential band; (v) the words "AGE-DEFYING Night Cream" printed in the bottom half of the bottle in white lettering; (vi) the word "Formula" printed after the NERIUMAD trademark in white lettering; (vii) the placement of the volume of the contents "__ ml/__ fl. oz." printed near the base of the bottle; and (viii) the product logo and name in the top half of the bottle in light grey lettering;

b.    NERIUMAD day creams:  (i) the shape of the bottle, specifically, a cylindrical plastic bottle with curved sides that narrow at the center; (ii) the coloring of the bottle, which is transparent at the base, white through most of the bottle body, reflective metallic or chrome colored at the top, and contains a narrow, light-green circumferential band near the center; (iii) the color, shape, and position of the leaf design near the top of the bottle; (iv) the word "FACE" printed in white lettering in the narrow, light-green circumferential band; (v) the words "AGE-DEFYING Day Cream" printed in the bottom half of the bottle in white lettering; (vi) the word "Formula" printed after the NERIUMAD trademark in black lettering; (vii) the placement of the volume of the contents "__ ml/__ fl. oz." printed near the base of the bottle; and (viii) the product logo and name in the top half of the bottle in light grey lettering;

c.    NERIUMAD body firming creams:  (i) the shape of the tube, specifically, a trapezoidal plastic tube that narrows toward a cap at the base of the bottle; (ii) the coloring of the tube, which is white through most of the tube body, reflective metallic or chrome-colored near the base, with a white cap attached to the base,

16

and contains a narrow, orange circumferential band near the center; (iii) the word "BODY" printed in white lettering in the narrow, orange circumferential band; (iv) the words "FIRMING Body Contour Cream" printed in the bottom half of the tube in white lettering; (v) the word "Formula" printed after the NERIUMAD trademark in black lettering; (vi) the placement of the volume of the contents "__ ml/__ fl. oz." printed near the base of the bottle; and (vii) the product logo and name in the top half of the tube in light grey lettering.

51.     The NERIUMAD Products also form a family of trade dress that is depicted above and includes, but is not limited to, the following elements: (i) the use of uniform color; (ii) the use of reflective metallic or chrome accent at the top or bottom; (iii) a narrow, circumferential band near the center of the product; (iv) a descriptive word for the use of the product printed within the circumferential band (e.g., "FACE" or "BODY"); (v) the words describing the product on the bottom half of the product below the circumferential band; (vi) the word "Formula" printed after the NERIUMAD trademark; (vi) the placement of the volume of the contents "__ ml/__ fl. oz." printed near the base of the bottle; and (vii) the product logo and name in the top half of the tube in light grey lettering.  By describing its trade dress in words, Nerium Biotech does not waive the right to rely on pictures as depicting the trade dress in question.

52.     The overall appearance of the NERIUMAD Products (referred to as the "NERIUM Trade Dress" hereafter) is inherently distinctive and nonfunctional. Alternatively, through the manufacturing, sales, testing, and promotional efforts by Nerium, the NERIUM Trade Dress has become widely known and recognized, and the NERIUM Trade Dress has acquired secondary meaning.

17

53. Nerium Biotech is the sole and exclusive owner of all rights, title, and interest to the NERIUM Trade Dress, which is valid, enforceable, and eligible for protection.

**The Knock-Off Products—The Optimera Line**

54. Before long, Nerium products had become a global success story, with brand partners selling millions of units of the Product Line. Nerium sought regulatory approval from countries all over the world, so that brand partners in places as distant as Saudi Arabia and Korea could bring the Product Line to customers. Because the *Nerium oleander* extract is the subject of heightened scrutiny in some foreign markets, Nerium modified its products to address regulatory concerns and then spent thousands of hours compiling research and petitioning regulatory agencies to allow their sale. Nerium's efforts were successful and now the Product Line is approved in over 40 countries.

55. From the beginning, Olson was told that this regulatory process would take time, and that he needed to identify which foreign markets he wished to enter first. But Olson was impatient with this constraint; he wanted a product without NAE-8® that could be sold in international markets immediately. The problem, however, was that he had signed up to distribute *Nerium* products exclusively.

56. Rather than work within the confines of his deal, Olson quietly set out to develop a knockoff behind Nerium's back. He called his product "Optimera," and later added another new product called "EHT" (collectively, the "Optimera Line"). The Optimera Line contained no extracts of the *Nerium oleander* plant. NI began selling the Optimera Line in Canada and Mexico in 2014, Korea in July 2015, and stands on the brink of introducing that line in Japan and Hong Kong. The Optimera Line is also sold in the United States. Olson claims that sales are on

18

a limited basis to brand partners, but Nerium has reason to believe that Olson is also on the brink of introducing Optimera in the United States.

57.     Nerium learned about the Optimera Line after an Olson subordinate contacted Nerium's vendor, asking the vendor to supply product for the knockoff.  Nerium asked Olson to explain this situation in or around Dallas and Addison, Texas in late 2013 or early 2014.  When confronted, Olson assured Nerium personnel—including Dennis Knocke, Michael Scott, and Joe Nester—that he would only sell the Optimera Line in countries where the Product Line had not yet been approved for sale. He called it a "placeholder" for the Product Line.  To stay within the confines of the Company Agreement, Olson could have worked with his business partner and exclusive manufacturer to develop this "placeholder" product.  He chose not to, however, because he had a personal financial interest in Optimera's manufacture.

58.     Olson's claim about Optimera's being a "placeholder," which he repeated several times, was false.  Olson knew that Nerium would believe him because he was the sole Manager of NI. Because of his misrepresentations, Nerium did not take immediate steps to enjoin Olson from selling the Optimera Line or terminate the Company Agreement.

59.     In July 2015, NI launched Optimera in South Korea although NERIUM products were fully approved and available for sale in that country.  When Nerium objected, Olson gave an excuse that the South Korea launch had been planned for months and it was too late to switch from the so-called "placeholder" to the permanent product.

60.     In early 2016, Nerium learned from public sources (not Olson himself) that NI planned new launches of Optimera in Japan and Hong Kong.  When confronted, this time Olson had no excuse because NERIUM products were already fully approved in those countries.  But he continued to make false assurances about his desire to sell NERIUM products and urged the

19

parties to work toward a business solution, which they did for weeks.  This was another ruse and delay tactic.  Even while these negotiations were taking place, Olson privately told associates that he planned to move to selling non-Nerium products exclusively, and that his partnership with Nerium would end.  Olson's goal was to string Nerium along with empty assurances, holding NERIUM's products captive for as long as possible under their exclusivity agreement, while he developed a new line of products that would wholly replace them.  As these facts show, Olson's ultimate object was his personal benefit—more money, more power, and more control for himself.

61.    After all these discussions ended without progress, Nerium finally understood that Olson's true intentions were not to sell NERIUM products, and that he was stalling.  This, combined with a greater awareness of Olson's accounting fraud (discussed below), led Nerium to conclude that Olson has never been sincere.

**Consumer Deception**

62.    Although willing to take NERIUM products off the market (while preventing Nerium from selling them), Olson is less willing to give up on the compelling scientific story and results that made NERIUM products so successful.  The branding and packaging for the Optimera Line are intentionally designed to imitate the NERIUM Product Line, bearing the exact same trade dress and trademarks, although the Optimera Line does not include any extracts from *Nerium oleander*.  Unless a consumer reads the fine print, the Product Line and the Optimera Line appear indistinguishable.  Here are some side-by-side comparisons:

20

| The Optimera Line | The Product Line |
|---|---|
|  | |
| Optimera body firming cream<br>http://www.nerium.ca/products/1054_ca | NERIUMAD body firming cream<br>http://www.nerium.com/products/1003_us |
| Optimera night cream | NERIUMAD night cream |



| Optimera day cream | NERIUMAD day cream |

EHT:



22

63.     In 2015, NI itself touted how much the Optimera Line looks like the Product Line. That this similarity would cause consumer confusion about the origin and quality of Optimera is obvious.

The product line featuring the Optimera™ Formula, which is sold internationally, includes the following two products:

- **Age-Defying Night Cream, Optimera Formula (30 ml/1 fl. oz.):** Nerium 's Optimera Formula is powered by two exclusive ingredients: the patented SIG-1273® and patent-pending SAL-14™, both of which are only available in this propriety formula. Like the Night Cream, NeriumAD Formula, the Optimera Night Cream is distinguished with a slate-colored bottle and a blue band.
- **Age-Defying Day Cream, Optimera Formula (30 ml/1 fl. oz.):** Nerium's breakthrough Age-Defying Day Cream, Optimera Formula also uses patented, exclusive age-fighting ingredients — including SIG-1273 and SAL-14. Its lightweight, hydrating formula is perfect for daytime use. Like the Day Cream, NeriumAD Formula, the Optimera Day Cream is set apart from the Night Cream by a white bottle with a blue band.

64.     Olson's efforts to equate Optimera with NERIUM products in the minds of consumers are deceptive. Specifically, Olson actively and purposefully leads consumers to believe that the Optimera Line is backed by the same science that has made the Product Line such a success. To promote the Optimera Line, NI even uses videos of scientists discussing the authentic Nerium product line without telling consumers that the scientists are talking about something completely different—and that the Optimera Line lacks the key ingredient, NAE-8®, that those scientists find compelling. Further, when entering foreign markets, like Canada, Olson even touts the sales success of the *Nerium* product line to suggest a likelihood of *Optimera's* success. (Olson compounds this deceit by claiming revenue totals for NI that far exceed the revenue on NI's books.)

**Olson's Dishonest Accounting Practices and Distributions**

65.     Beyond knocking off Nerium products, Olson has abused his fiduciary position and violated the Company Agreement by allocating profits and distributions in an unfair manner for his own benefit. As far as Nerium knows, this abuse has occurred in and around Dallas and Addison, Texas, where NI (the Company of which Olson is the sole manager) is headquartered.

23

66.     Olson's "creative" accounting is visible on the face of NI's own "equity allocation worksheets," which, despite their dubious completeness and accuracy, clearly show that Olson is ignoring the Company Agreement to put more money in his own pocket.

67.     Article V of the Company Agreement requires the Company to allocate profits and make distributions to all Members, on a pro-rata basis, according to the Members' respective Percentage Interest (subject only to the profit sharing regarding Marketing Aids in Section 21.03). The Company Agreement also provides for a percentage *increase* in the distribution in favor of Nerium SkinCare when the Company meets certain sales thresholds.

68.     NI, under Olson's direction, has never allocated to Nerium SkinCare 30% of the Company's self-reported profits.  NI's worksheets do not show how this is justified, but they do show a double standard.  For example, Nerium SkinCare has openly been charged about 30% of the Company's costs for developing the knockoff Optimera Line and EHT products, but received only 20% of the profits from those products.

69.     Recently, after years of dispute and almost a year of litigation—including discovery in this case designed to understand NI's reasoning (which NI stonewalled)—NI finally conceded that its position was indefensible.   In July 2016, NI's CFO notified Nerium that NI would allocate 30% of Optimera's profits to Nerium.  But it still has not paid Nerium the millions of dollars that it is owed, with interest, from the prior misallocations. That money went to JO Products—Olson's wholly owned entity.

70.     Further, Olson has not complied with Section 21.04's requirement of increased revenue to Nerium SkinCare based upon gross cash proceeds from the sale of the Product Line exceeding certain thresholds. NI exceeded the relevant threshold in August 2013, but the

24

Company has not made the requisite payment increases to Nerium SkinCare in violation of Article V and Section 21.04 of the Company Agreement.

71.     Additionally, in violation of Article V, Olson has taken money out of the Company for himself (JO Products) without making corresponding pro-rata distributions to Nerium SkinCare as required by the Company Agreement and his fiduciary duties.  These self-serving distributions were made arbitrarily and at Olson's whim, usually to meet whatever personal financial need Olson had at the moment (e.g., to pay a tax bill).  To give himself cover, he would send money to Nerium SkinCare after the fact, but never in proportion to his own distributions or with proper notification or computation:

   a.   In 2013, Olson distributed cash to himself nine times, receiving $20,834,154 total (73.37% of total 2013 cash distributions).   He distributed cash to Nerium SkinCare five times, on a sporadic basis, for a total of $7,563,000 (26.63% of total 2013 cash distributions).

   b.   In 2014, Olson distributed cash to himself eight times. JO Products received $33,000,000 (74% of total 2014 cash distributions).  He used a pricing dispute between the parties to avoid paying Nerium SkinCare anything until they settled that dispute.   After the settlement, Nerium SkinCare received a single lump payment of $11,475,000 (26% of total 2014 cash distributions).

   c.   In January 2015, Olson distributed to himself $5,500,000 (79% of total January 2015 distributions), but only $1,500,000 to Nerium SkinCare (21% of total January 2015 distributions).

25

     d.  In February 2015, Olson distributed $1,000,000 to JO Products and $1,000,000 to what appears to be his brokerage firm.  He distributed $0 to Nerium Skincare.

72.    In an apparent attempt to freeze out Nerium SkinCare, Olson has made no distributions to it since January 2015.

**Other Fraud & Self-Dealing**

73.    Olson has used other tactics to take money from the Company to benefit his friends, associates, and himself. Without full inspection of NI's accounting records, Nerium can only identify some instances of fraud.  But even the limited information Nerium has been able to obtain from NI's records (for which Olson is responsible) makes clear that Olson's dishonest tactics are far reaching. Already, it is evident that Olson knowingly and actively misrepresented the purpose of expenditures, concealed the reasons for expenditures, and concealed the existence of certain other expenditures that he had a fiduciary duty to disclose as the Manager of NI. Olson's omissions and misrepresentations allowed Olson's scheme to go undetected, resulting in substantial financial loss to Nerium and the Company.

74.    In September of 2014, Olson caused NI to make a "loan" to his ex-spouse, and current NI-officer, Renee Olson. This loan was in the amount of approximately $347,000 and served no business purpose.  On the records that Nerium received from Olson, Olson obscured the recipient of this loan by entering the loan in the general ledger as a payment to "Stone & Bruce – Real Estate Bridge Loan."  This was classified as an "investment" on NI's December 31, 2014 financial statements.   Only later, when Nerium sought more information about this "investment," did it learn that it was really a personal loan.

26

75.     On information and belief, "Stone" and related entities are being used to hide other transactions as well. For example, NI's records show that in 2013, "Stone Enterprises" received "monthly subscription" payments of $5,000 and $10,000.  Payments totaling $253,145 were made to Stone Enterprises between 2013 and 2015.  Payments totaling $188,220 were made to Stone & Bruce between 2013 and 2015.  Olson and NI have refused to identify the business purpose served by these payments, which are highly suspect given how these entities were used to conceal a personal loan to Olson's family.

76.     NI's records also show that, between 2013 and 2015, NI paid at least $164,615 to NEFX.  Through its own investigation, Nerium has learned that NEFX is an entity owned by Jeff Branch, an officer of NI.  There is no demonstrated business purpose for these transactions.  This secret funneling of money to an officer of NI amounts to fraud and self-dealing (or aiding and abetting self-dealing).  It also breaches the Company Agreement's provision that no officer will receive more than $500,000 annual compensation without Nerium's approval. *See* Company Agreement § 6.06.

77.     In 2014, Olson caused the Company to make other payments to Renee Olson—for $290,000—and to Olson's daughter, Amber Olson-Rourke—for $420,000—that were either reported to the IRS as 1099 payments or not at all, despite the fact that both are officers of the Company.

78.     For the life of the Company, Olson has made other hidden payments to himself, his family (Renee and Amber Olson), other officers, and his associates by paying them substantial compensation as distributors or Brand Partners—although they did no work as distributors or Brand Partners.  NI did not disclose these payments to Nerium despite a duty to do so.

27

79.     Olson has also caused the Company to make payments to his personal friend and roommate, Stuart Johnson.  Johnson was paid with NI funds for "rent" on the beach house he shares with Olson, and personally received other payments, for a total of at least $410,000, between 2013 and 2015.  On July 31, 2015, NI reclassified a payment for $200,000 originally made to Johnson as paid to JO Products (Olson's entity), which is yet further evidence that money paid to Johnson was actually for Olson's benefit.

80.     Besides this, NI paid millions of dollars to Stuart Johnson's entity, Success Partners.  In 2013, Success Partners received over $9,000,000 from NI.  In 2015, it received over $12,500,000. At least $400,000 of this money was used to purchase "Live Happy," a defunct magazine that has lost millions of dollars.  At the very least, this was a Fundamental Business Transaction for which Nerium SkinCare's consent was required, and which Olson did not try to obtain. *See* Company Agreement § 6.02(a).  Likely, these were payments ultimately for Olson's own benefit which Johnson shared with him.

81.     Olson has caused NI to make suspect payments to Don Gardner.  These payments amounted of $10,000 a month from at least August to December of 2013, and by June 2015 had risen to $18,333 a month (totaling almost a half-million dollars). Nerium is unaware of any service that Don Gardner provides to NI—and NI has refused to explain.  Don Gardner, however, is a shareholder of Nerium Biotechnology, and he has used this position to solicit Nerium Biotechnology shareholders and attack its management.  If Gardner is a paid "insider" to disrupt Nerium Biotechnology's management and governance, that is a highly improper use of Company funds.

28

82.     Several other suspicious transactions appear on the Company's general ledger. These transactions do not appear to advance NI's business purposes and ownership of the entities remains unknown:

    a.   Payments totaling $3,590,000 to FARC LLC between 2013 and 2015.

    b.   Payments totaling $1,448,482 to Paradise Life between 2013 and 2015.

    c.   Payments totaling $200,000 to Fotobar LLC between 2013 and 2015.

    d.   Payments totaling $257,016 to Quarter after Three between 2013 and 2015.

    e.   Payments totaling $210,789 to Graham Bright and Smith between 2013 and 2015.

    f.   Payments totaling $99,395 to Sree Nalabolu between 2013 and 2015.

Plaintiffs believe that many, if not all, of the foregoing transactions are to disguise payments to Olson, his relatives, or his associates.  An inspection of NI's books and records is needed to determine just how far Olson's fraudulent scheme reaches.

## CLAIMS FOR RELIEF

### CLAIM I
### TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT
### (Against Olson and NI)

83.     Nerium incorporates the foregoing paragraphs by reference.

84.     Nerium is the exclusive owner of the NERIUM Marks. These marks are valid and protectable. Defendants used the NERIUM Marks in commerce by affixing them to the Optimera Line, and then selling and offering the Optimera Line for sale. NI did this without Nerium's consent, and in violation of the Company Agreement.

29

85.     Because the Optimera Line is virtually identical to the Product Line, ordinary consumers of both products are likely to be confused, mistaken, or deceived. Consumers are likely to be confused about the source of the goods because they will likely believe that Nerium researched, developed, and manufactured the Optimera Line when it did not. Consumers are also likely to be confused about the sponsorship of the goods because they will likely believe that Nerium stands behind the Optimera Line when it does not. These actions by NI violate the Lanham Act, 15 U.S.C. § 1114(1)(a).

86.     NI had constructive notice of Nerium's registered NERIUM Marks, including the U.S. federal trademark applications that existed before NI's formation. In addition, NI had actual notice of Nerium's registered NERIUM Marks as a result of the execution of the Company Agreement and, at least, because Nerium contacted NI and requested that it cease using the NERIUM Marks in connection with the sale of the Optimera Line.

87.     Olson has vicariously infringed Nerium's Marks.  Olson, as the Manager of NI, has the right and ability to control NI's actions, including its infringing actions, and has derived a financial benefit from the infringement.

88.     Olson has also contributorily infringed Nerium's Marks.  Olson knows about NI's infringement and acts to materially contribute or induce the infringement through his managerial role. Further, upon information and belief, Olson has had a substantial role in developing, designing, marketing, and selling the infringing Optimera Line.

89.     Defendants' activities have harmed Nerium. Accordingly, Nerium is entitled to recover its damages, NI's profits received as a result of the infringing activities and conduct, and the costs of bringing this action under 15 U.S.C. § 1117. Because NI's activities have been willful, deliberate, and knowingly and intentionally designed to trade upon the goodwill of the

NERIUM Marks, to cause confusion and mistake, and to deceive the public, Nerium is also entitled to treble damages and reasonable attorneys' fees under 15 U.S.C. § 1117(a).

90.      Unless restrained by this Court, Defendants' actions will cause ongoing harm to Nerium. Nerium has no control over the quality or production of the Optimera Line.   Any deficiency in the Optimera Line will reflect adversely on Nerium, by whom customers will assume the products were manufactured or endorsed.   If Defendants are allowed to continue to use the NERIUM Marks, Nerium will suffer irreparable injury to its reputation.   Nerium has no adequate remedy at law for Defendants' violations of 15 U.S.C. § 1114.   Because this irreparable injury cannot be adequately calculated or compensated solely by money damages, Nerium seeks preliminary and permanent injunctive relief under 15 U.S.C. § 1116.

### CLAIM II
### FALSE DESIGNATION OF ORIGIN; FALSE DESCRIPTIONS OR REPRESENTATIONS UNDER THE LANHAM ACT
### (Against Olson and NI)

91.      Nerium incorporates the foregoing paragraphs by reference.

92.      Nerium is the exclusive owner of the NERIUM Marks. These marks are valid and protectable. NI used the NERIUM Marks in commerce by affixing them to the Optimera Line, and then selling and offering the Optimera Line for sale.   NI did this without Nerium's consent, and in violation of the Company Agreement.   Further, Olson is vicariously and contributorily liable for NI's conduct through Olson's management of NI.   Upon information and belief, Olson has had a substantial role in developing, designing, marketing, and selling the infringing Optimera Line.

93.      Defendants' use of the NERIUM Marks, in commerce and without Nerium's authorization, in connection with the sale of products not from, produced, or sponsored by Nerium, namely the Optimera Line, constitutes a false designation of origin, false or misleading

31

description of fact, or false or misleading representation of fact. Because the Optimera Line is virtually identical to the Product Line in appearance, consumers are likely to be confused, mistaken, or deceived as to the nature of the affiliation, connection, or association between Defendants and Nerium. For the same reason, consumers are likely to be confused, mistaken, or deceived as to the origin, sponsorship, or approval of the Optimera Line by Nerium in violation of 15 U.S.C. § 1125(a)(1)(A).

94.     In addition, because Defendants use the NERIUM Marks in commercial advertising or promotion, and misrepresent the nature, characteristics and qualities of the Optimera Line by associating it with the Product Line, Defendants violate 15 U.S.C. § 1125(a)(1)(B).

95.     Defendants had constructive notice of Nerium's registered NERIUM Marks, including the U.S. federal trademark applications that existed before Defendants' formation. In addition, Defendants had actual notice of Nerium's registered NERIUM Marks as a result of the execution of the Company Agreement and, at least, because Nerium contacted NI and requested that it cease using the NERIUM Marks in connection with the sale the Optimera Line.

96.     Defendants' activities have harmed Nerium. Accordingly, Nerium is entitled to recover its damages, Defendants' profits received as a result of the infringing activities and conduct, and the costs of bringing this action under 15 U.S.C. § 1117. Because NI's activities have been willful, deliberate, and knowingly and intentionally designed to trade upon the goodwill of the NERIUM Marks, to cause confusion and mistake, and to deceive the public, Nerium is also entitled to treble damages and reasonable attorneys' fees under 15 U.S.C. § 1117(a).

97.    Unless restrained by this Court, Defendants' actions will cause ongoing harm to Nerium. Nerium has no control over the quality or production of the Optimera Line. Any deficiency in the Optimera Line will reflect adversely on Nerium, by whom customers will assume the products were manufactured or endorsed. If Defendants are allowed to continue to use the NERIUM Marks, Nerium will suffer irreparable injury to its reputation. Nerium has no adequate remedy at law for Defendants' violations of 15 U.S.C. § 1114. Because this irreparable injury cannot be adequately calculated or compensated solely by money damages, Nerium seeks preliminary and permanent injunctive relief under 15 U.S.C. § 1116.

## CLAIM III
## TRADE DRESS INFRINGEMENT UNDER THE LANHAM ACT
### (Against Olson and NI)

98.    Nerium incorporates the foregoing paragraphs by reference.

99.    Nerium is the exclusive owner of the NERIUM Trade Dress. This Trade Dress is valid and protectable. NI used the NERIUM Trade Dress in commerce by packaging the Optimera Line in virtually identical trade dress, and then selling and offering the Optimera Line for sale. NI did this without Nerium's consent, and in violation of the Company Agreement. Further, Olson is vicariously and contributorily liable for NI's infringement through his management of NI.  Upon information and belief, Olson has had a substantial role in developing, designing, marketing, and selling the infringing Optimera Line.

100.    Defendants' use of the NERIUM Trade Dress, in connection with the sale of products not from, produced, or sponsored by Nerium, namely the Optimera Line, constitutes a false designation of origin, false or misleading description of fact, or false or misleading representation of fact. Because the Optimera Line is virtually identical to the Product Line in appearance, consumers are likely to be confused, mistaken, or deceived as to the nature of the

33

affiliation, connection, or association between Defendants and Nerium. For the same reason, consumers are likely to be confused, mistaken, or deceived as to the origin, sponsorship, or approval of the Optimera Line by Nerium in violation of 15 U.S.C. § 1125(a)(1)(A).

101.    In addition, because Defendants use the NERIUM Trade Dress in commercial advertising or promotion, and misrepresent the nature, characteristics, and qualities of the Optimera Line by associating it with the Product Line, Defendants violate 15 U.S.C. § 1125(a)(1)(B).

102.    Defendants had constructive notice of Nerium's NERIUM Trade Dress as a result of the execution of the Company Agreement and, at least, because Nerium contacted NI and requested that it cease using the NERIUM Trade Dress in connection with the sale of the Optimera Line.

103.    Defendants' activities have harmed Nerium. Accordingly, Nerium is entitled to recover its damages, Defendants' profits received as a result of the infringing activities and conduct, and the costs of bringing this action under 15 U.S.C. § 1117.  Because NI's activities have been willful, deliberate, and knowingly and intentionally designed to trade upon the goodwill of the NERIUM Trade Dress, to cause confusion and mistake, and to deceive the public, Nerium is also entitled to treble damages and reasonable attorneys' fees under 15 U.S.C. § 1117(a).

104.    Unless restrained by this Court, Defendants' actions will cause ongoing harm to Nerium. Nerium has no control over the quality or production of the Optimera Line.  Any deficiency in the Optimera Line will reflect adversely on Nerium, by whom customers will assume the products were manufactured or endorsed.  If Defendants are allowed to continue to use the NERIUM Trade Dress, Nerium will suffer irreparable injury to its reputation. Nerium has

34

no adequate remedy at law for Defendants' violations of 15 U.S.C. § 1114. Because this irreparable injury cannot be adequately calculated or compensated solely by money damages, Nerium seeks preliminary and permanent injunctive relief under 15 U.S.C. § 1116.

## CLAIM IV
## COMMON LAW TRADEMARK INFRINGEMENT
### (Against Olson and NI)

105.    Nerium incorporates the foregoing paragraphs by reference.

106.    Nerium is the exclusive owner, and senior user, of the NERIUM Marks. These marks are valid and protectable.  Defendants used the NERIUM Marks in commerce by affixing them to the Optimera Line, and then selling and offering the Optimera Line for sale. Defendants did this without Nerium's consent, and in violation of the Company Agreement.

107.    Because the Optimera Line is virtually identical to the Product Line, ordinary consumers of both products are likely to be confused, mistaken, or deceived. Consumers are likely to be confused about the source of the goods, because they will likely believe that Nerium researched, developed, and manufactured the Optimera Line, when it did not. Consumers are also likely to be confused about the sponsorship of the goods because they will likely believe that Nerium stands behind the Optimera Line, when it does not.

108.    Defendants' use of the NERIUM Marks, in commerce and without Nerium's authorization, in connection with the sale of products not from, produced, or sponsored by Nerium, namely the Optimera Line, constitutes a false designation of origin, false or misleading description of fact, or false or misleading representation of fact. Because the Optimera Line is virtually identical to the Product Line in appearance, consumers are likely to be confused, mistaken, or deceived as to the nature of the affiliation, connection, or association between

35

Defendants and Nerium. For the same reason, consumers are likely to be confused, mistaken, or deceived as to the origin, sponsorship, or approval of the Optimera Line by Nerium.

109.    Defendants' activities and conduct therefore constitute common law trademark infringement under the laws of the State of Texas.

110.    Defendants had constructive notice of Nerium's registered NERIUM Marks, including the U.S. federal trademark applications that existed before Defendants' formation. In addition, Defendants had actual notice of Nerium's registered NERIUM Marks as a result of the execution of the Company Agreement and, at least, because Nerium contacted NI and requested that it cease using the NERIUM Marks in connection with the sale of the Optimera Line.

111.    Defendants' activities have harmed Nerium. Accordingly, Nerium is entitled to recover its damages, Defendants' profits received as a result of the infringing activities and conduct, and the costs of bringing this action. NI has acted with malice and specific intent to cause substantial injury to Nerium.  Because NI's activities have been willful, deliberate, and knowingly and intentionally designed to trade upon the goodwill of the NERIUM Marks, to cause confusion and mistake, and to deceive the public, Nerium is also entitled to exemplary damages and reasonable attorneys' fees.

112.    Unless restrained by this Court, Defendants' actions will cause ongoing harm to Nerium. Nerium has no control over the quality or production of the Optimera Line.  Any deficiency in the Optimera Line will reflect adversely on Nerium, by whom customers will assume the products were manufactured or endorsed.  If Defendants are allowed to continue to use the NERIUM Marks, Nerium will suffer irreparable injury to its reputation.  Nerium has no adequate remedy at law for Defendants' infringement. Because this irreparable injury cannot be

36

adequately calculated or compensated solely by money damages, Nerium seeks preliminary and permanent injunctive relief.

## CLAIM V
## COMMON LAW TRADE DRESS INFRINGEMENT
### (Against Olson and NI)

113.    Nerium incorporates the foregoing paragraphs by reference.

114.    Nerium is the exclusive owner of the NERIUM Trade Dress. This Trade Dress is valid and protectable. Defendants used the NERIUM Trade Dress in commerce by packaging the Optimera Line in virtually identical trade dress, and then selling and offering the Optimera Line for sale. Defendants did this without Nerium's consent, and in violation of the Company Agreement.

115.    Defendants' use of the NERIUM Trade Dress, in connection with the sale of products not from, produced, or sponsored by Nerium, namely the Optimera Line, constitutes a false designation of origin, false or misleading description of fact, or false or misleading representation of fact. Because the Optimera Line is virtually identical to the Product Line in appearance, consumers are likely to be confused, mistaken, or deceived as to the nature of the affiliation, connection, or association between Defendants and Nerium. For the same reason, consumers are likely to be confused, mistaken, or deceived as to the origin, sponsorship, or approval of the Optimera Line by Nerium.

116.    Defendants' activities therefore constitute common-law trade dress infringement under the laws of the State of Texas.

117.    Defendants had constructive notice of Nerium's NERIUM Trade Dress as a result of the execution of the Company Agreement and, at least, because Nerium contacted NI and

requested that it cease using the NERIUM Trade Dress in connection with the sale the Optimera Line.

118.     Defendants' activities have harmed Nerium. Accordingly, Nerium is entitled to recover its damages, Defendants' profits received as a result of the infringing activities and conduct, and the costs of bringing this action. NI has acted with malice and specific intent to cause substantial injury to Nerium.  Because NI's activities have been willful, deliberate, and knowingly and intentionally designed to trade upon the goodwill of the NERIUM Trade Dress, to cause confusion and mistake, and to deceive the public, Nerium is also entitled to exemplary damages and reasonable attorneys' fees.

119.     Unless restrained by this Court, Defendants' actions will cause ongoing harm to Nerium. Nerium has no control over the quality or production of the Optimera Line.   Any deficiency in the Optimera Line will reflect adversely on Nerium, by whom customers will assume the products were manufactured or endorsed.  If Defendants are allowed to continue to use the NERIUM Trade Dress, Nerium will suffer irreparable injury to its reputation.  Nerium has no adequate remedy at law for Defendants' infringement. Because this irreparable injury cannot be adequately calculated or compensated solely by money damages, Nerium seeks preliminary and permanent injunctive relief.

### CLAIM VI
### COMMON LAW UNFAIR COMPETITION
### (Against Olson and NI)

120.     Nerium incorporates the foregoing paragraphs by reference.

121.     Nerium is the exclusive owner of the NERIUM Marks and NERIUM Trade Dress. These Marks and Trade Dress are valid and protectable. Defendants used the NERIUM Marks and Trade Dress in commerce by affixing them to the Optimera Line, and then selling and

38

offering the Optimera Line for sale. Defendants did this without Nerium's consent, and in violation of the Company Agreement.

122.    The NERIUM Marks and NERIUM Trade Dress are inherently distinctive or, alternatively, have acquired secondary meaning and have become distinctive through Nerium's substantially exclusive and continuous use, as well as through the widespread and significant promotion and advertising of Nerium's goods and services under the NERIUM Mark and Trade Dress.

123.    Defendants' activities and conduct wrongfully use and benefit from Nerium's goodwill and reputation under both the NERIUM Marks and NERIUM Trade Dress. The Optimera Line directly competes with the Product Line. As a result, Defendants obtain a special advantage over Nerium because they are burdened with none of the expense incurred by Nerium in building the goodwill associated with the NERIUM Marks and the NERIUM Trade Dress. This constitutes unfair competition under the common law of the State of Texas. As such, Nerium Biotech is entitled to recover any and all remedies provided by the common law.

124.    Defendants had constructive notice of the NERIUM Marks and NERIUM Trade Dress as a result of the execution of the Company Agreement and, at least, because Nerium contacted NI and requested that it cease using the NERIUM Marks and NERIUM Trade Dress in connection with the sale of the Optimera Line.

125.    Defendants' activities have harmed Nerium. Accordingly, Nerium is entitled to recover its damages, Defendants' profits received as a result of the infringing activities and conduct, and the costs of bringing this action. NI has acted with malice and specific intent to cause substantial injury to Nerium. Because NI's activities have been willful, deliberate, and knowingly and intentionally designed to trade upon the goodwill of the NERIUM Marks and

NERIUM Trade Dress, to cause confusion and mistake, and to deceive the public, Nerium is also entitled to exemplary damages and reasonable attorneys' fees.

126.     Unless restrained by this Court, Defendants' actions will cause ongoing harm to Nerium. Nerium has no control over the quality or production of the Optimera Line.   Any deficiency in the Optimera Line will reflect adversely on Nerium, by whom customers will assume the products were manufactured or endorsed.   If Defendants are allowed to continue to use the NERIUM Marks and the NERIUM Trade Dress, Nerium will suffer irreparable injury to its reputation. Nerium has no adequate remedy at law for Defendants' infringement. Because this irreparable injury cannot be adequately calculated or compensated solely by money damages, Nerium seeks preliminary and permanent injunctive relief.

**CLAIM VII**
**BREACH OF CONTRACT**
**(Against Olson and NI on behalf of Nerium SkinCare, only)**

127.     Nerium incorporates the foregoing paragraphs by reference.

128.     The Company Agreement is a contract governing the relationship between Nerium, the Company, JO Products, and Olson.

129.     Nerium SkinCare has performed its obligations under the Company Agreement, and all conditions precedent have been performed or have occurred.

130.     The Company Agreement provides that the purpose of NI is to sell Nerium products and that NI must do so on an exclusive basis.   Olson and the Company have breached the contract by selling non-Nerium products.

131.     The Company Agreement provides that the Manager will not do any act in violation of the Company Agreement. Olson is the sole manager of the Company and has caused the Company to violate the Company Agreement.

40

132.     The Company Agreement also provides that Olson, in his capacity as Manager, "will not . . . solicit business for . . . any business which produces or distributes cosmetic products which are materially similar to or competitive with" those produced by Nerium. Because NI has solicited business for a competing company by selling the Optimera Line through NI's network of brand partners, it has breached its contract with Nerium.  The Optimera Line is materially similar to and competitive with the Product Line.

133.     As sole manager, moreover, Olson was "delegated the sole authority for the organization, supervision and oversight of the marketing efforts of the Company, and in such capacity shall supervise and manage the Company efforts to: . . . (b) promote and advertise the Product Line; . . . (h) plan and coordinate sales and promotional events for the Product Line on a nationwide and, as the markets for the Product Line expand, worldwide basis; . . . ." (emphasis added).  He was not delegated authority to market similar or competing products outside the Product Line.  In violation of this directive, Olson has caused the Company to promote and advertise the Optimera Line in jurisdictions where the Product Line is available for sale. This promotion and advertisement of the Optimera Line is detrimental to sales of the Product Line and detracts from promotion efforts that should be directed to the Product Line.

134.     By selling a similar, replacement, or competing product, Olson and the Company breached their obligation to "use best efforts to promote the[] sale" of the Product Line distributed exclusively by the Company. Tex. Bus. & Comm. Code § 2.306(b).  Such sales directly undermine the Product Line.  Additionally, those sales efforts detract from efforts that should instead be directed toward selling the Product Line.

135.     Olson and the Company have breached the Company Agreement by failing to allocate profits and make pro-rata distributions to Nerium SkinCare as required by Article V of

41

the Company Agreement.  One result was that JO Products received excess distributions belonging to Nerium.

136.    Olson and the Company have breached Section 21.03 Company Agreement by failing to comply with the profit-sharing procedure for Net Profits from Marketing Aids.  One result was that JO Products received excess distributions belonging to Nerium.

137.    Olson and the Company have breached Article V and Section 21.04 the Company Agreement by failing to pay increased revenue to Nerium SkinCare based upon gross cash proceeds from the sale of the Product Line exceeding the stated thresholds since August of 2013.  One result was that JO Products received excess distributions rightfully belonging to Nerium.

138.    Olson and the Company's material breaches of the Company Agreement have caused and continue to cause injury to Nerium SkinCare, and excuse Nerium SkinCare's future performance.

139.    Nerium SkinCare seeks damages within the jurisdictional limits of this Court, as well as termination of the Company Agreement.  Meanwhile, and in the alternative if necessary, Nerium SkinCare seeks preliminary and permanent injunctions restraining NI from selling products that are not authorized by Nerium.  Nerium SkinCare's damages are not adequate to compensate it for the lost opportunity to grow their product distribution base and revenue and to invest in further cancer and other health-research activities.  They also cannot compensate for the harm to Nerium SkinCare's brand, goodwill, and reputation when its exclusive product distributor chooses to sell a competing product in Nerium's place.

## CLAIM VIII
## MONEY HAD AND RECEIVED
### (Against JO Products, on behalf of Nexium SkinCare)

140.    Nerium incorporates the foregoing paragraphs by reference.

42

141.    From at least 2013 to 2015, JO Products accepted distributions from NI in excess of the amount it was rightfully owed. Increased distributions to JO Products result in a corresponding decrease in distributions to Nerium SkinCare, which Nerium SkinCare is rightfully owed under the Company Agreement.

142.    The excess distributions that JO Products received belong, in equity and good conscience, to Nerium SkinCare.

143.    Upon information and belief, JO Products holds the amount of those excess distributions.

144.    Nerium is entitled to damages from JO Products in the amount of those excess distributions.

## CLAIM IX
## BREACH OF FIDUCIARY DUTY
### (Against Olson, on behalf of NI)

145.    Nerium incorporates the foregoing paragraphs by reference.

146.    Olson is the sole Manager of the Company and owes fiduciary duties of loyalty, candor, integrity, fair and honest dealing, and full disclosure to the Company.  He also owes a duty not to usurp corporate profits for personal gain, and a duty to use uncorrupted business judgment for the sole benefit of the Company.

147.    Olson breached those duties—by:

    a.    Causing the Company to make loans and payments to himself, his relatives, and co-conspirators, for personal gain and not a business purpose.

    b.    Usurping Company profits and making distributions of cash to JO Products (a company he owns and controls) in excess of JO Products's percentage share for his personal enrichment and to the detriment of the Company;

43

c.   Causing the Company to keep incomplete and misleading accounting records that conceal, omit, or obscure his self-dealing.

d.   Withholding payments and distributions to Nerium SkinCare in an effort to freeze it out.

e.   Manufacturing and selling the Optimera Line, in which he had a personal financial interest, in favor of the Product Line.

f.   Failing to disclose his intent to develop and introduce the Optimera Line, and the transactions related thereto.

g.   Making intentionally false statements to the public that reflect poorly on the Company.

148.    Olson's breaches of fiduciary duty have injured the Company.  For example, by siphoning money away from the Company, Olson has reduced its capital and weakened its financial health.  Olson's irregular accounting practices have also opened the Company up to potential liability.  Olson's introduction of the inferior Optimera Line, in his own self-interest, will damage the Company's long-term profitability.

149.    For those reasons, Nerium SkinCare seeks damages on behalf of the Company.  In the interest of justice, under section 101.463 of the Business Organizations Code, the damages should be paid directly to Nerium.

150.    Olson's intentional acts of misconduct entitle the Company to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

151.    To remedy Olson's breaches of fiduciary duty in this closely held enterprise, the Court should also enter a decree to wind up and terminate the Company.

## CLAIM X
## FRAUD
### (Against Olson)

152.    Nerium incorporates the foregoing paragraphs by reference.

153.    Olson has caused NI to make payments to entities owned by him, his family members, or associates, for improper purposes while concealing the existence of those payments or their true nature.

154.    Olson either omitted to inform Nerium SkinCare of those payments and distributions, when he had a duty to do so, or misrepresented the nature of the payments to Nerium SkinCare in accounting documents. This information was material because it affected the financial health of NI and decreased Nerium SkinCare's distributions, and because it is improper to make payments to oneself or one's associates without a business purpose.

155.    Olson misrepresented his intentions regarding the sale of the Optimera Line when he told Nerium that the product would only be a "placeholder." That was false. By these omissions and misrepresentations, Olson intended to defraud Nerium, and Nerium relied on the same.  Nerium believed Olson because he is the sole Manager of NI and in a position of trust. Olson knew this. This prevented Nerium from taking immediate action against the sale of Optimera.

156.    Plaintiffs are entitled to actual and exemplary damages for Olson's fraud.

## CLAIM XI
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)
### (Against Olson)

157.    Nerium incorporates the foregoing paragraphs by reference.

45

158.   Plaintiffs assert a RICO claim under 18 U.S.C. § 1962(c) because Olson has willfully or knowingly engaged in a pattern of racketeering activity involving a separate enterprise that affects interstate commerce.

159.   As explained in paragraphs 65–82, Olson has committed fraud.  It was reasonably foreseeable that interstate mail and wire communications would be used in furtherance of this fraud, and the same actually occurred, injuring Nerium in its business and property.

160.   As a result, this fraudulent conduct constitutes wire fraud because Olson knowingly used interstate wire communications such as telephone calls, internet communications, and interstate bank wire transfers to further his scheme to defraud Nerium. Each of the fraudulent transactions and distributions described in paragraphs 65–82 was executed by interstate wire or mail.  This same conduct also constitutes mail fraud because Olson knowingly used the United States Postal Service to send and deliver various communications across state lines in furtherance of his fraudulent scheme. The parties, content, dates, places, means, and reasons for this conduct are detailed throughout this complaint.

161.   Olson engaged in a pattern of racketeering activity by engaging in wire and mail fraud on an ongoing basis. These fraudulent acts were related, all designed to take money from the Company (and, by extension, Nerium) and to put more money in the pockets of Olson and his relatives and associates.  As Nerium's fraud claim indicates, this pattern was a continuous scheme lasting more than two consecutive years and is likely to continue.

162.   In committing mail and wire fraud, Olson involved two separate enterprises. First, Olson involved JO Products, a company wholly owned by Olson, which he used to conduct his fraudulent scheme. Olson funneled money through JO that should have been distributed to Nerium. Second, Olson involved NI, of which he is the sole Manager, to conduct his fraudulent

46

scheme. Olson caused Nerium to make fraudulent distributions, and payments to sham vendors. Both of these enterprises exist separate and apart from Olson's pattern of racketeering, because both JO Products and NI engage in other business activities. Both of these enterprises are involved in interstate commerce because both directly engage in the production, distribution, or acquisition of goods and services in interstate commerce.

163.    Nerium has suffered injury to its business and property as a result of Olson's conduct. Nerium requests actual damages, treble damages, costs, lost value of money, and attorneys' fees.

## CLAIM XII
## JUDICIAL WIND-UP & TERMINATION
### (Against All Defendants)

164.    Nerium incorporates the foregoing paragraphs by reference.

165.    The Court should order the winding up and termination of the Company on legal and equitable grounds.

166.    First, it is not reasonably practicable to carry on Company business in conformity with its governing documents, which requires its termination under Texas Business Organizations Code § 11.314.  For example, the Company has failed and refused to enter a DLA that is an essential term of the Company Agreement.  Further, its growing dependence on knockoff products of inferior quality frustrates the purpose for which it was created, and damages the NERIUM brand.  Because the Company has entered into manufacturing agreements with other manufacturers, it is not reasonably practicable for Nerium to remain bound to one customer—the Company.   And fundamental disagreements between the Manager of the Company and the leadership of Nerium about whether Olson's actions will damage the Company and harm its customers further make business impracticable.

47

167.    The Court should also order the winding up and termination of the Company as a remedy for Defendants' material breach of the Company Agreement, which excuses Nerium SkinCare's future performance.

168.    Further, the Court should order the winding up and termination of the Company as an equitable remedy for Olson's breaches of fiduciary duty and other misconduct.

169.    Alternatively, if the foregoing grounds are not available, the Court should recognize a common-law cause of action to terminate a closely held company agreement for breach.   The Texas Supreme Court has recognized that "the foreseeability, likelihood, and magnitude of harm sustained by minority shareholders due to the abuse of power by those in control of a closely held corporation is significant, and Texas law should ensure that remedies exist to appropriately address such harm when the underlying actions are wrongful." *Ritchie v. Rupe*, 443 S.W.3d 856, 879 (Tex. 2014).  It further observed that "a proper case might justify our recognition of a new common-law cause of action to address a 'gap' in protection for minority shareholders." *Id.* at 890.   Shareholders of closely held corporations have a statutory right to terminate for breach of a close corporation agreement, which essentially codifies the grounds for termination that are pleaded above.   Tex. Bus. Org. Code § 21.756.  Because a parallel provision does not exist for minorities in closely held *LLCs*, a protection gap would exist if none of the above-pleaded grounds for termination applied here.

170.    Nerium SkinCare requests that the Court appoint a qualified person to carry out the winding up of the Company who is not affiliated with any Defendant.  *See* Tex. Bus. Org. Code § 11.054.

48

## CLAIM XIII
## DECLARATORY JUDGMENT
### (Against All Defendants)

171.    Nerium incorporates the foregoing paragraphs by reference.

172.    An actual and immediate justiciable controversy exists between the parties concerning the NERIUM Marks and the NERIUM Trade Dress and, specifically, ownership of those marks. An actual and immediate justiciable controversy also exists as to the effect of the Company Agreement.

173.    **Regarding trademark ownership**, Nerium seeks the following judicial declarations:

a.    Defendants do not own, either in whole or in part, the NERIUM Marks or the NERIUM Trade Dress.

b.    Nerium is the sole and exclusive owner of the NERIUM Marks and the NERIUM Trade Dress used on or in connection with, by way of example and not by way of restriction, skincare products, multi-level marketing, retail, and distribution services.

c.    Nerium is the sole and exclusive owner of the marks identified in the following U.S. trademark applications and registrations: the N & design mark in U.S. Trademark Registration No. 4469321; the N & design mark in U.S. Trademark Registration No. 4425567; the N NERIUM INTERNATIONAL & design mark in U.S. Trademark Application Serial No. 86276118; the N NERIUM & design mark in U.S. Trademark Application Serial No. 86276158; the NERIUM mark in U.S. Trademark Application Serial No. 86276183; the THE NERIUM EXPERIENCE

49

mark in U.S. Trademark Application Serial No. 86368419; the THE NERIUM EXPERIENCE mark in U.S. Trademark Application Serial No. 86370727; the N NERIUM & design mark in U.S. Trademark Application Serial No. 86413924; and the N NERIUM & design mark in U.S. Trademark Application Serial No. 86413976.

    d.    NI is not, and has never been, licensed to place the NERIUM mark on the Optimera Line.

    e.    NI is not, and has never been, licensed to use NERIUM trade dress on the Optimera Line.

174.    **Regarding the sale of products**, Nerium seeks the following judicial declarations:

    a.    That the Company Agreement only grants the Company non-exclusive distribution rights in OTC products (with the exception of acne products, which are exclusive) and that Nerium has the right to distribute OTC products to third parties other than the Company.

    b.    That the Company Agreement precludes NI from selling, advertising, or endorsing the Optimera Line.

    c.    That NI's refusal to accept or sell the Product Line, or its failure to use its best efforts in doing so, entitles Nerium to terminate the contract or avail itself of the remedies provided by Tex. Bus. & Comm. Code §§ 2.610, 2.703, 2.703, or 2.711, including, without limitation, withholding those products, reselling to another buyer, and cancellation.

## CLAIM XIV
## APPLICATION TO COMPEL INSPECTION OF RECORDS & INFORMATION
### (Against NI)

175.     Nerium incorporates the foregoing paragraphs by reference.

176.     Nerium SkinCare is a member of Nerium International, LLC.

177.     Section 101.052(a) of the Business Organizations Code provides that a member of a limited liability company, on written request and for a proper purpose, may examine and copy at any reasonable time: (1) records required under Sections 3.151 and 101.501; and (2) other information regarding the business, affairs, and financial condition of the company that is reasonable for the person to examine and copy.  Tex. Bus. Orgs. Code § 101.502.

178.     This statutory inspection right is separate and independent from Nerium's discovery rights.  *Burton v. Cravey*, 759 S.W.2d 160 (Tex. App.—Houston [1st Dist.] 1988, no writ) (a court will not "engraft discovery notions upon [a party's] statutory right of inspection, which is independent of any right of discovery in litigation").  The right of members to inspect books and records "is only limited by the requirement that the inspection be for any proper purpose."  *Shioleno v. Sandpiper Condos. Council of Owners, Inc.*, No. 13-07-00312-CV, 2008 Tex. App. LEXIS 5289, at *12 (Tex. App.—Corpus Christi July 17, 2008, no pet.).

179.     On May 10, 2016, Nerium made a written request to examine NI's records and information. *See* **Exhibit C.** The request's purpose was "to evaluate whether the Company's accounting methods and equity allocations comply with the Company Agreement, to determine the correct equity and cost allocations, and to investigate accounting irregularities and suspected self-dealing." *See id.* The request seeks access to records required under Sections 3.151 and 101.501 and other documents related to the financial condition of the Company. *See id.*

51

180.    Nerium also demands more records and information regarding the Company's transfers in excess of $16,000,000 to off-shore accounts, resulting in reduced distributions to Nerium SkinCare. In July 2014, Olson caused NI to transfer $10,000,000 to a Bank of America account in the name of CGTN C.V. in Curacao. And in July/August of 2015, NI transferred another $5,750,000 to the same entity. Olson also caused NI to transfer an additional $12,000,000 to an account in the Netherlands to an entity called "NI – B.V. Netherlands." Finally, between February and July of 2015, Olson caused NI to transfer $3,000,000 to an account in Mexico.  Nerium has no insight into how these funds are used by the foreign entities.

181.    On May 20, 2016, NI issued a written refusal to comply with Nerium's request to examine its records and information. *See* **Exhibit D.**  NI objected that some of the requested information has already been provided to auditors, which was not true.  While Nerium's outside auditors reviewed many NI records, this was only to ensure that *Nerium* publicly reported a reasonable fair market value of its investment in NI accompanied by required footnote disclosure of NI's summary financial data on a GAAP basis.  The auditors did not try to resolve the concerns Nerium SkinCare expressed in its record request and did not review those records.  And while NI was initially cooperative with these auditors in early 2015, that cooperation deteriorated as NI pressed ahead with plans to sell its knockoff product internationally.  Ultimately, NI expelled the auditors to prevent them from finding something that would jeopardize its litigation position, although the auditors were not looking for such evidence.

182.    NI further objected that a book-and-records demand "is not a way to circumvent discovery proceedings."  This objection overlooks that a member's inspection rights are independent of its discovery rights.  It also overlooks that NI refuses to provide the same information in discovery.  Either way, NI must give its member access, which is long overdue.

## REVERSE VEIL PIERCING

183.    Nerium incorporates the foregoing paragraphs by reference.

184.    The Court should disregard the corporate fiction of JO Products's separate existence because JO Products is nothing more than an alter ego for Jeff Olson.  Olson is the sole owner of JO Products and exercises total control over its activities.  Olson has also commingled his own assets with those of JO Products, and he uses those assets to pay personal expenses.  For example, on February 27, 2015, Olson caused NI to transfer $1,000,000 to Olson's personal broker, although only JO Products is entitled to distributions as a member of the Company.  Further, Olson caused NI to distribute profits for Marketing Aids to JO Products, even though the Company Agreement provides that those profits belong to Olson, personally.  Olson uses JO Products as a conduit for his business activities, but Olson is the only meaningful actor—there are no others.  Upon information and belief, JO Products is also undercapitalized.

185.    The Court should also disregard the corporate fiction of JO Products's separate existence because Olson has used JO Products to perpetrate actual fraud for his direct personal benefit.  This complaint details Olson's fraudulent distributions, which he funneled through JO Products to unjustly enrich himself personally.  Olson's actions were dishonest, as he intended to deceive Nerium about the amount of distributions it was owed.

## ATTORNEYS' FEES

186.    Nerium incorporates the foregoing paragraphs by reference.

187.    Nerium SkinCare is entitled to its recover reasonable and necessary attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code because this action is for breach of contract and Nerium SkinCare has retained counsel.

53

188.    Nerium SkinCare is entitled to its attorneys' fees under Section 101.461 of the Business Organizations Code because of the substantial benefit this action confers on the Company.

## REQUESTED RELIEF

Plaintiffs respectfully request that judgment be entered in their favor and against Defendants and request relief as follows:

A.    That judgment be entered in favor of Nerium and against each Defendant in accordance with each of the above counts.

B.    That Defendants be adjudged to have intentionally infringed and copied Nerium's NERIUM Marks and NERIUM Trade Dress, and to have manufactured, distributed, marketed, advertised, or sold infringing goods, and that Defendants be adjudged to have falsely designated the origin of its goods, and therefore be required to pay, under applicable federal, state, and/or common law:

1.    Nerium's actual damages and any profits of Defendants resulting from the infringement, the false designation of origin and false representations, including all profits received by Defendants from sales and revenues of any kind made as a result of its actions;

2.    Three times the actual damages of Nerium or profits of Defendants resulting from the infringement;

3.    Nerium's reasonable attorneys' fees;

4.    Nerium's costs and expenses; and

5.    Prejudgment and postjudgment interest.

C.    Issuance of a preliminary injunction under applicable federal, state, and/or common law, enjoining Defendants, their officers, agents, employees, servants, attorneys, successors, and assigns, and all those controlled by, acting on behalf of, in privity with, or acting in concert or active participation with Defendants, from:

1.    Advertising, selling, offering for sale, shipping, or transporting any product bearing the NERIUM mark "Nerium" to be used for skin care, except for those products that Defendants purchase directly from Plaintiffs;

2.      Advertising, selling, offering for sale, shipping, or transporting any product bearing the "N" mark to be used for skin care, except for those products that Defendants purchase directly from Plaintiffs; and

3.      Advertising, selling, offering for sale, shipping, or transporting any product using the NERIUM Trade Dress to be used for skin care, except for those products that Defendants purchase directly from Plaintiffs.

D.      That Nerium be permitted to conduct expedited discovery relating to the requested preliminary injunction, including discovery as to any planned skin-care products using the NERIUM Marks or NERIUM Trade Dress, the current countries where the Optimera Line is advertised, offered, and sold, and the persons who have manufactured, distributed, advertised, marketed, imported, or sold the Optimera Line within the United States.

E.      Issuance of a permanent injunction under applicable federal, state, and/or common law, enjoining Defendants, their officers, agents, employees, servants, attorneys, successors, and assigns, and all those controlled by, acting on behalf of, in privity with, or acting in concert or active participation with Defendants, from:

1.      Infringing Nerium's NERIUM Marks or NERIUM Trade Dress;

2.      Inducing or enabling others to directly or indirectly manufacture, distribute, advertise, market, or sell one or more infringing goods or services under Nerium's NERIUM Marks and NERIUM Trade Dress;

3.      Directly or indirectly manufacturing, distributing, advertising, marketing, or selling products in any fashion which would state, imply, or suggest that products not from Nerium, such as the Optimera Line, are associated with or come from the same source as Nerium;

4.      Directly or indirectly using or incorporating Nerium's NERIUM Marks or NERIUM Trade Dress, or confusingly similar marks or trade dress, alone or in combination with other words or dress, to identify, market, distribute, advertise, promote, offer for sale, or provide infringing goods or services;

5.      Continuing, or inducing others to directly or indirectly commit, the acts of false designation of origin or quality of Defendants' products and unfair trade practices complained-of herein;

6.      Making or inducing others to make any false, misleading, or deceptive statement of fact, or representation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of one or more infringing goods or services in such fashion as to suggest that such infringing goods or services are connected with or associated with or sponsored by Nerium or

55

its genuine products identified by the NERIUM Marks and NERIUM Trade Dress;

7.     Palming off, or inducing others to palm off, any service or product as a service or product of Nerium Biotech; and

8.     Otherwise unfairly competing with Nerium or doing any acts that may cause Defendants' goods to be mistaken for, confused with, or passed off as Nerium's goods.

F.     Defendants be ordered to deliver up for destruction all products, labels, signs, plates, packages, dies, wrappers, receptacles, literature, advertisements, and other materials in their possession or under its control, bearing any words, terms, names, symbols, devices, or any combination thereof, which: simulate, reproduce, counterfeit, copy or colorably imitate the NERIUM Marks or NERIUM Trade Dress in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any product not from Nerium, including the Optimera Line.

G.     An order directing Defendants to take corrective action to correct any erroneous impression the public may have derived from infringement or unfair competition concerning the source or origin of Defendants' infringing products, including without limitation the placement of corrective advertising.

H.     An order compelling NI to submit to an inspection of its records and information.

I.     An order directing the wind-up of the Company.

J.     The appointment of another individual, unaffiliated with any Defendant, to carry out the winding up of the Company.

K.     Declaratory judgment on the counts requested herein.

L.     Actual and exemplary damages.

M.     A declaration that this is an exceptional case.

N.     Reasonable and necessary attorneys' fees.

O.     All costs of suit.

P.     An award of such other relief to Plaintiffs as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Nerium hereby demands a trial by jury on all claims that may be tried before a jury.

Respectfully Submitted,


/s/Jonathan R. Mureen
Scott D. Levine
State Bar No. 00784467
sdl@banowsky.com
Baxter W. Banowsky
State Bar No. 00783593
bwb@banowsky.com
BANOWSKY & LEVINE PC
12801 N. Central Expressway Suite 1700
Dallas, Texas 75243
Telephone:  214-871-1300
Telecopier:  214-871-0038

Michael S. Forshey
State Bar No. 07264250
michael.forshey@squirepb.com
Jonathan R. Mureen
State Bar No. 24060313
jon.mureen@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
2000 McKinney Ave. Suite 1700
Dallas, Texas 75201
Telephone: 214-758-1500
Facsimile: 214-758-1550

**ATTORNEYS FOR NERIUM SKINCARE,
INC. AND NERIUM BIOTECHNOLOGY, INC.**


**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served in accordance with the Federal Rules of Civil Procedure on all counsel of record via the Court's ECF system on this 27th day of July 2016.


/s/Jonathan R. Mureen


57