UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NERIUM SKINCARE, INC., on behalf of itself and in a derivative capacity for Nerium International, LLC, and NERIUM BIOTECHNOLOGY, INC., | § § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:16-CV-1217-B |
| | § | |
| NERIUM INTERNATIONAL, LLC, JEFF A. OLSON, and JO PRODUCTS, LLC, | § § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Plaintiffs Nerium Skincare, Inc. and Nerium Biotechnology, Inc.'s

(collectively Plaintiffs) Motion for Preliminary Injunction. Doc. 36, Pls.' Mot. for Prelim. Inj. [ Pls.'

Mot.].For the reasons set forth below, the Court finds that the motion should be, and hereby is,

**DENIED**.

I.

BACKGROUND

A.    *Factual History*[1]

This case involves a trademark dispute between a manufacturer of skin care products and its

---

[1]The Court takes its factual history from the parties' briefing and appendices, as well as from the arguments and testimony presented at the preliminary injunction hearings on November 1, 2016, November 30, 2016, and December 1, 2016. Wherever possible, the Court has provided citation to these materials. Any disputed facts are noted as such.

exclusive distributor. Incorporated in Canada in 2006, Plaintiff Nerium Biotechnology, Inc. (Nerium Biotech) is a scientific research and development company originally established to explore anti-cancer, anti-viral, immune-stimulating, and dermal benefits of the *Nerium oleander* plant. Doc. 36, Pls.' Mot. 2; Doc. 37, App. 2, Decl. of Dennis Knocke ¶ 4. While researching the plant's potential to combat certain forms of skin cancer, Nerium Biotech stumbled upon a discovery that extract from the *Nerium oleander* plant also had remarkable age-defying effects. Doc. 36, Pls.' Mot. 2. Recognizing the potential for a consumer product that could fund its cancer research, Nerium Biotech developed a method of isolating and extracting parts of the *Nerium oleander* plant for use in consumer skin care products. *Id.* Nerium Biotech eventually patented its unique extraction method and, in 2009, formed a division—Nerium SkinCare—to develop a line of consumer skin care products centered around the extract of the *Nerium oleander* plant. Doc. 37, App. 2, Decl. of Dennis Knocke ¶¶ 6, 9.

In early 2009, the SkinCare division developed and produced its first two products: (1) NeriumDerm, a natural skin repair cream, and (2) NeriumCS, a lip and cold sore relief product. *Id.* ¶¶ 10–12. These two products were reportedly sold to Nerium Biotech shareholders and their families and friends in 2009 and 2010 through in-person sales at Nerium Biotech's offices in San Antonio, as well as online through Nerium's website. Doc. 36, Pls.' Mot. 2–3; Doc. 37, App. 3, Decl. of Dennis Knocke ¶ 11–12.[1] These early products bear the trademarks "NeriumDerm" and "NeriumCS." *See* Doc. 37, App. 22, 26. According to Plaintiffs, this was the first use of any of their trademarks in commerce. Doc. 36, Pls.' Mot. 3.[2]

_____

[1] *See* Doc. 37, App. 22, 26 for images of these products and their packaging.

[2] On January 25, 2010, Nerium Biotech applied to register "NeriumDerm," "NeriumCS," and "Nerium Skincare" trademarks, each with a graphic of a *Nerium oleander* flower. *See* Doc. 37, App. 30, 31, 32. These

Because the NeriumDerm and Nerium CS products "tested well," Nerium Biotech began exploring marketing and distribution options for skin care products. *Id.* A Nerium Biotech shareholder introduced the company to Defendant Jeff Olson in early 2010. Doc. 37, App. 5, Decl. of Dennis Knocke ¶ 17. Olson had extensive experience with multi-level marketing distribution structures. *Id.* ¶¶ 17–18. In April 2010, Olson sent a letter to Nerium Biotech's President, Dennis Knocke, outlining a potential relationship between Nerium Biotech and a new company to be formed specifically for the purpose of marketing and selling products developed by Plaintiffs containing *Nerium oleander* extract. *See* Doc. 37, App. 41, Ex. 4. Generally speaking, the division of labor described in that letter envisioned that Nerium Biotech would be responsible for the development, approval, and manufacture of the products, and Olson, through the new company, would be responsible for the marketing, distribution, and sale of the products. *See generally id.* In September 2010, Nerium Biotech spun off the SkinCare division into a separate but wholly-owned subsidiary, Nerium SkinCare, Inc. (Nerium SkinCare). Doc. 37, App. 6, Decl. of Dennis Knocke ¶ 22. The following month, Defendant Nerium International, LLC (NI) was formed as a separate Texas limited liability company, as described in Olson's April 2010 letter. *Id.* ¶ 23. The only two members of NI are a limited liability company owned by Jeff Olson, Defendant JO Products, LLC, which is a 70% owner of NI, and Nerium SkinCare, which is a 30% owner of NI. Doc. 37, Ex. 5, Company

---

trademarks were registered on February 22, 2011, with "first use in commerce" dates of June 1, 2009. *Id.* (Reg. Nos. 3,921,445; 3,921,447; and 3,921,446, respectively). Plaintiffs later applied to register the generic trademarks "NERIUMDERM," "NERIUMCS," and "NERIUM SKINCARE" without the oleander flower graphics and "without any claim to any particular font, style, size, or color." *See* Doc. 37, App. 35, 36, 34 (Reg. Nos. 4,069,525; 4,062,274; and 4,069,528, respectively). These generic marks, consisting only of the words "NERIUMDERM," "NERIUMCS," and "NERIUM SKINCARE," were registered on December 13, 2011, November 29, 2011, and December 13, 2011, respectively, again with "first use in commerce" dates of June 1, 2009. *Id.*

Agreement, Ex. A. The relationship between Plaintiffs and the newly formed NI was captured in the Company Agreement, signed on April 6, 2011, and made retroactive to NI's formation on October 25, 2010. Doc. 37, App. 6, Decl. of Dennis Knocke ¶¶ 22–24.

The Company Agreement—which is generally consistent with Olson's April 2010 letter—provides that the "primary purpose" of NI is the "development, purchase, distribution and sale of all cosmetic and over the counter ('OTC') products that have been developed, or are in the future developed [by Plaintiffs], some of which will be utilizing and/or incorporating extracts from the Nerium Oleander." Doc. 37, Ex. 5, Company Agreement § 2.05. It further provides that, with certain exceptions in Central America, NI is the "sole and exclusive worldwide distributor of the Product Line." *Id.* § 4.03. The "Product Line" is defined in the attached Exhibit C, which describes certain categories of products of which NI is the exclusive distributor and others which NI may distribute on a non-exclusive basis. *Id.* at Ex. C. Per the Agreement, Plaintiffs are "tasked with the production of the Product Line and its delivery . . . to the distribution facilities of [NI] fully packaged and ready for distribution," and Olson—"as the sole Manager of [NI]"—has the "sole authority for the organization, supervision and oversight of the marketing efforts of [NI]." *Id.* §§ 4.03, 6.13. As such, Olson may "not directly or indirectly, own, manage, operate, control, be employed by, perform services for, consult with, solicit business for, participate in, or be connected with the ownership, management, operation or control of any business which produces or distributes cosmetic products which are materially similar to or competitive with the Product Line." *Id.* § 6.03.[3]

---

[3]These brief excerpts from the Company Agreement are included here only to describe generally the relationship and responsibilities of the parties as outlined in the Company Agreement. Their inclusion is in no way intended to convey that these are the only relevant provisions, and additional provisions relating to the specific trademark disputes at issue are discussed below.

With the relationship between the parties established, Plaintiffs—in consultation with NI—developed the first product to be distributed by NI: an age-defying night cream, NeriumAD, which NI launched in the United States in August 2011. Doc. 37, App. 6–7, Decl. of Dennis Knocke ¶¶ 25–27. Consistent with the multi-level marketing strategy, this product—like all Plaintiffs' later products—was distributed through NI's system of "brand partners," which are independent contractors of NI who both sell NI's products directly to the public as well as recruit additional brand partners to sell NI's products.

The original NeriumAD night cream was packaged in graphite-colored, cylindrical plastic bottles with curved sides that narrowed at the center, and featured the "NeriumAD" name running vertically down the bottle. *Id.* at 7–8, Decl. of Dennis Knocke ¶¶ 28–30. It also displayed a new stylized "N" mark near the bottom of the bottle. *Id.*[4] For a few years, the NeriumAD night cream was the only product sold by NI, and it was a huge success, making $100 million in revenue in the first full year of operations. *Id.* at 8, Decl. of Dennis Knocke ¶ 30. Based on the success of the NeriumAD night cream, NI asked Plaintiffs to develop a day cream. *Id.* at 8, Decl. of Dennis Knocke ¶ 31. After a year of research and development, NeriumAD day cream launched in the United States in September 2013. *Id.* The packaging for the day cream was similar to the night cream, except the

---

[4]*See* Doc. 37, App. 8 for an image of the original NeriumAD night cream product. Plaintiffs applied to register the "NERIUMAD" trademark on July 12, 2011, the month before the night cream launched. *See* Doc. 37, App. 37. The registration was for the word "NERIUMAD" "without claim to any particular font, style, size, or color." *Id.* The "NERIUMAD" mark was registered to Plaintiffs on October 2, 2012, with a "first use in commerce" date of August 2011. *Id.* (Reg. No. 4,219,079).

The "N" design, on the other hand, is registered to NI. *See* Doc. 56, App. 116 (Reg. No. 4,469,321). NI filed its application to register the "N" mark on March 27, 2013, two and a half years after the first NeriumAD product featuring the mark launched. *Id.* It was registered to NI on January 21, 2014, with a "first use in commerce" date of August 30, 2011, which corresponds to the launch of the NeriumAD night cream. *Id.*

bottle was pearl-colored rather than graphite, and the day cream had the words "AGE-DEFYING DAY CREAM" underneath the "NeriumAD" mark instead of "AGE-DEFYING TREATMENT," as was seen on the night cream. *See id.* at 9. The third and final of Plaintiffs' products to launch was a body contour cream, NeriumFirm, which was released in the United States in April 2014. *Id.* at 8–10, Decl. of Dennis Knocke ¶¶ 35–37. Somewhat different than the night and day creams, the body contour cream was packaged in a trapezoidal-shaped blue and white tube and featured a new "NeriumFirm" trademark. *See id.* at 10.[5] It also bore the stylized "N" mark first seen on the NeriumAD night and day creams. *See id.* The NeriumAD night and day creams and the NeriumFirm body contour cream are the only three products ever developed by Plaintiffs for distribution by NI, and until April 2014, NI sold only these three products. Doc. 36, Pls.' Mot. 5.

The Company Agreement provided that Plaintiffs would use their "best efforts to procure any and all governmental regulatory certifications and approvals that may be required for the distribution and sale of the Product Line into each jurisdiction that [NI] determines is an appropriate market." Doc. 37, Ex. 5, Company Agreement § 4.03. However, the main ingredient in Plaintiffs' products—the *Nerium oleander* extract—is subject to heightened regulatory scrutiny in many countries. Doc. 36, Pls. Mot. 5. Therefore, "[u]nable to keep waiting on [Plaintiffs] to do [their] job, NI outsourced development and paid millions of dollars to create and promote an alternative international product line"—Optimera—which NI first launched in Canada in April 2014 and in Mexico in October 2014. Doc. 55, Def.'s Resp. 5. Plaintiffs admit they had not obtained regulatory

---

[5]Plaintiffs applied to register the "NERIUMFIRM" trademark on January 30, 2014, several months before the product launched. *See* Doc. 37, App. 40. The registration was for the word "NERIUMFIRM" "without claim to any particular font, style, size, or color." *Id.* The "NERIUMFIRM" mark was registered to Plaintiffs on May 10, 2016, with a "first use in commerce" date of May 1, 2014. *Id.* (Reg. No. 4,956,348).

approval for their products in either Canada or Mexico when Optimera launched there. Doc. 37, App. 11–12, Decl. of Dennis Knocke ¶¶ 44, 47.

Initially, the Optimera line included only two products: the Optimera Day Cream and the Optimera Night Cream. Doc. 36, Pls.' Mot. 5–6. No products in the Optimera line have ever included *Nerium oleander* extract. *Id.* at 6. The original Optimera day and night creams did not bear any of Plaintiffs' registered trademarks, though they were packaged in bottles shaped similar to that of Plaintiffs' NeriumAD night and day creams. *See id.* at 6. The original Optimera bottles were blue (Optimera Night Cream) and white (Optimera Day Cream) and featured the name "Optimera" running vertically down the bottle with a new trademark—an incomplete circle design—near the bottom of the bottle. *Id.* Though visually distinct from Plaintiffs' NeriumAD products, the original Optimera products do feature a similar layout of text and design. *Compare* Doc. 37, App. 8, *with* Doc. 37, App. 12. Plaintiffs contend Olson repeatedly reassured them that the Optimera products were intended simply as placeholders until Plaintiffs obtained regulatory approval for an international product containing the *Nerium oleander* extract. Doc. 36, Pls.' Mot. 6.

Sometime in late 2014—the parties disagree on precisely when—NI made Plaintiffs aware of its plan to rebrand all products sold by NI to "better convey the upscale nature of its products, better leverage the name Nerium International and clarify its three prong product platform of Face, Body, Mind." Doc. 55, Def.'s Resp. 5.[6] At least initially, Plaintiffs appear to have gone along with this rebranding "so that a consistent look would be present between the Nerium Products and Optimera

---

[6]At this time NI sold only five products: three from Plaintiffs (NeriumAD night cream, NeriumAD day cream, and NeriumFirm body contour cream), and two from NI (Optimera day cream and Optimera night cream).

Products." Doc. 37, App. 13–14, Decl. of Dennis Knocke ¶ 52. However, Plaintiffs contend their acquiescence was based on an understanding that they would eventually become the manufacturer of the Optimera products and that sales of Optimera would cease as Plaintiffs obtained regulatory approval for the Nerium products in international markets. *Id.* Defendants disagree that any such understanding existed, though multiple emails back and forth between the parties seem to suggest otherwise.[7] To resolve the Optimera issue, the parties first underwent mediation in February 2015. *Id.* This mediation was unsuccessful, however, and the rebranded products were publicly released in April 2015. Doc. 55, Def.'s Resp. 5.

The original five rebranded products incorporate several design elements of the previous NeriumAD products, such as the shape and color of the night and day cream bottles and the presence of the graphic "N" mark. *See* Doc. 36, Pls.' Mot. 7. The size and direction of the text changed and, for the first time, "Nerium International" was prominently displayed just below the "N" design, which was now near the top of the bottle. *See id.* Each product featured a colored band around the middle, and the "NeriumAD" trademark was in much smaller font below the colored band on the NeriumAD day and night creams. *See id.* The body contour cream, NeriumFirm, remained in a trapezoidal-shaped tube but was brought more in line with the day and night creams in other elements of the design. *See id.* The two rebranded Optimera products are almost identical to the NeriumAD products, except they identify in small font the presence of the "Optimera Formula" rather than the "NeriumAD Formula." *Compare* Doc. 36, Pls.' Mot. 7, *with* Doc. 36, Pls.'

---

[7] *See, e.g.*, Doc. 64, App. 204, Dec. 5, 2014 email from NI's co-CEO Jeff Dahl recapping a meeting of NI's and Plaintiffs' management teams and stating "we will also plan for a 'pilot' run of Optimera by NBI" and "we will discuss how to 'sequence' from Optimera to NeriumAD and/or combine in targeted new markets."

Mot. 8.

In May 2015, one month after the rebranded products were released, NI also began selling a dietary supplement for brain enhancement, EHT, both in the United States and internationally. Doc. 55, Def.'s Resp. 5.[8] Subsequently, in September 2015, NI released its own body contour cream under the Optimera label. Doc. 37, App. 13, Decl. of Dennis Knocke ¶ 50. The Optimera body contour cream, like the Optimera day and night creams, is only sold outside of the United States, but it matches the rebranded products in appearance. *Id.*; *see* Doc. 36, Pls.' Mot. 8. Finally, following another unsuccessful mediation in early 2016, NI launched an eye serum product in the United States and abroad in April 2016. Doc. 37, App. 13, Decl. of Dennis Knocke ¶ 59; Doc. 36, Pls.' Mot. 8. The packaging for the eye serum is also consistent with the rebranded Nerium and Optimera products. *See* Doc. 36, Pls.' Mot. 8.

Though initially launched only in Canada and Mexico, Optimera is now sold in several additional international markets, including Korea and Japan. Doc. 55, Def.'s Resp. 5–6. According to NI, however, the three Optimera products—the Optimera day, night, and firming creams—are not sold in the United States. *Id.* at 31. Plaintiffs dispute this, and NI acknowledges that its eye serum and EHT brain enhancement supplement are sold both in the United States and abroad. *Id.* at 5–6.

B.    *Procedural History*

Nerium Skincare initially filed suit against NI in Texas state court in August 2015, claiming breach of the Company Agreement and requesting an accounting and declaratory relief regarding

---

[8]*See* Doc. 53, Pls.' 2d Am. Compl. 22 for an image of the EHT product. While the EHT product does not appear to fall within the Optimera product line—as it does not contain the "Optimera Formula"—its packaging is consistent with the rebranded trade dress.

NI's use of intellectual property. Doc. 1, Notice of Removal 18–25. Olson and his company, JO Products, LLC, were later added as defendants to the state court suit before it was eventually removed to this Court on May 4, 2016, based on diversity jurisdiction. *See* Doc. 1, Notice of Removal. Then on May 31, 2016, the present case was consolidated with a trademark suit—filed in February 2016—pending in the Eastern District of New York by Nerium Biotech against NI. *See* Docs. 12, 14. After consolidation, both sides were granted leave to file amended pleadings in this Court. *See* Doc. 14, Order.

Plaintiffs filed their First Amended Complaint on June 2, 2016, which included claims for, *inter alia*, trademark and trade dress infringement under the federal Lanham Act and Texas common law, breach of contract, and a request for preliminary and permanent injunctive relief. Doc. 18, 1st Am. Compl.[9] Later that month, Plaintiffs filed the present Motion for Preliminary Injunction, arguing for an injunction based on the underlying claims for trademark and trade dress infringement and breach of the Company Agreement. Doc. 36. NI responded on July 29, 2016 (Doc. 55), and Plaintiffs replied on August 12, 2016 (Doc. 63). Defendants were granted leave to file a sur-reply, which they did on October 25, 2016. Doc. 118. Subsequently, the Court held preliminary injunction hearings on November 1, 2016, November 30, 2016, and December 1, 2016. Finally, the Court allowed the parties to file additional briefing, which Plaintiffs submitted on December 8, 2015 (Doc. 146), and NI submitted on December 15, 2016 (Doc. 148). Plaintiffs' Motion is now ripe for review.

---

[9]Plaintiffs' operative pleading at this time is actually the Second Amended Complaint, filed July 27, 2016. Doc. 53. However, the First Amended Complaint of June 2, 2016, was Plaintiffs' first request for injunctive relief in this Court.

## II.

## LEGAL STANDARD

"The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). To demonstrate entitlement to a preliminary injunction, a party must establish the following four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). Because a preliminary injunction is an extraordinary form of equitable relief, the movant must "clearly carr[y] the burden of persuasion on all four requirements." *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). Failure of the movant to establish any one of the four elements will result in denial of the preliminary injunction. *Medlin v. Palmer*, 874 F.2d 1085, 1091 (5th Cir. 1989).

## III.

## ANALYSIS

A.    *Scope of the Requested Injunction*

As a preliminary matter, the Court must first address the limited scope of the injunction now requested by Plaintiffs, which in turn affects the analysis the Court must follow in deciding the motion for preliminary injunction. Plaintiffs' initial motion sought to enjoin NI from selling or advertising any product not supplied by Plaintiffs bearing the word "Nerium," the "N" mark, or the rebranded trade dress, as well as "any product competing with or similar to Plaintiffs' products." Doc.

36-1, Proposed Order. Plaintiffs originally asserted three grounds for the requested injunction: (1) trademark infringement; (2) trade dress infringement; and (3) breach of the Company Agreement's exclusive dealing provisions. Doc. 36, Pls.' Mot. 9. Thus, an injunction as initially requested likely would have totally prevented NI from selling Optimera products altogether.[10]

Beginning with their Reply, however, Plaintiffs have shifted gears and limited the scope of the relief sought. Doc. 63, Pls.' Reply 3 ("Finally, for purposes of interim relief, Nerium would accept a preliminary injunction that preserved the status quo as it existed for a year of settlement negotiations before Nerium was forced to seek injunctive relief, and which would prevent NI from *expanding* Optimera to new markets . . . .") (emphasis in original) (internal footnote omitted). At the preliminary injunction hearing on November 1, 2016, Plaintiffs confirmed this limited scope, arguing for an injunction based solely on the trademark and trade dress issues and not on the breach of contract claim. Doc. 137, Nov. 1, 2016 Hr'g Tr. 11:18–12:24 ("But for the purposes of framing why we are here . . . and we framed it this way, started framing it this way in our reply brief. We are not trying to stop them from selling Optimera altogether. . . . But for purposes of our hearing, we want them to stop calling it Nerium. It's a trademark issue. . . . They can go back to calling it what they used to call it, Optimera."). Thus, while Plaintiffs still maintained that NI's sales of Optimera (and the eye serum and EHT) ultimately violated the Company Agreement, at the time of the November 1 hearing Plaintiffs only sought to enjoin NI from selling Optimera (and the eye serum and EHT) under the trademarks and rebranded trade dress allegedly owned by Plaintiffs, not to stop them from

---

[10]It also likely would have barred sales of NI's eye serum and EHT brain enhancement supplement as well because both products—though not technically Optimera products as they do not contain the "Optimera Formula"—feature the rebranded trade dress.

selling Optimera products altogether.[11]

Later, in their supplemental brief to the Court, Plaintiffs further narrowed the scope of their requested relief, indicating they no longer seek an injunction based on trade dress or the "common law mark, 'Nerium,'" but instead only request an injunction based on Plaintiffs' "registered marks and the N-Design." Doc. 146, Pls.' Suppl. Br. 2 n.1 ("[Plaintiffs] also own[ ] the trade dress and the common law mark, 'Nerium,' but [they are] not pursuing that ground for an injunction at this time . . . ."). Therefore, for purposes of this opinion, the Court need only address Plaintiffs' trademark arguments as they relate to Plaintiffs' registered trademarks and the "N" mark, which as noted above is registered to NI.

B.    *Trademark Claims*

To demonstrate entitlement to a preliminary injunction, Plaintiffs must first show a substantial likelihood of success on the merits of their underlying claim for trademark infringement. *Janvey*, 647 F.3d at 595. In evaluating likelihood of success on the merits, courts consider the standards provided by substantive law. *Id.* at 596. Federal trademark infringement claims are governed by the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* To succeed in an action for trademark infringement under the Lanham Act, a plaintiff must establish two elements: (1) that it has a protectable right in the mark; and (2) that there is a likelihood of confusion between the plaintiff's mark and a mark used by the defendant. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008). The same test applies for claims of trademark infringement under Texas common

---

[11]For ease of reference, going forward the Court will use the term "Optimera products" to refer to all five products developed by NI: the three featuring the "Optimera Formula," the eye serum, and the EHT brain enhancement supplement.

law. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.7 (5th Cir. 2010) (citing *Horshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 n.3 (Tex. App.—Austin 2001, pet. denied)); *see also All Am. Builders, Inc. v. All Am. Siding of Dall., Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet.) ("The issues in a common law trademark infringement action under Texas law are no different than those under federal trademark law.").

Most trademark infringement actions focus largely on the second element—the likelihood of confusion analysis—which usually involves comparing a trademark in use by a plaintiff side-by-side with a trademark in use by a defendant to determine whether the two marks are similar enough that consumers would likely be confused as to the "source, affiliation, or sponsorship" of the plaintiff's product. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). In doing so, courts consider a non-exhaustive list of factors, known as the "digits of confusion," including "(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) and evidence of actual confusion." *Id.* Also relevant is the degree of care exercised by potential purchasers. *Id.* No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors. *Id.*

This case is unusual, however, in that the Court's analysis for purposes of this preliminary injunction motion turns on the first element: whether Plaintiffs have established protectible rights in the claimed marks. Though generally lumped into a single element, there are actually two inquiries encompassed by this element: the protectability of the mark, and the ownership of the mark. *See, e.g., id.* at 474 ("To prevail on their trademark infringement claim, the plaintiffs must show two things.

First, they must establish *ownership* in a *legally protectible* mark, and second, they must show infringement demonstrating a likelihood of confusion.") (emphasis added). After review of the parties' extensive briefing and evidence, it is this first element where the Court finds Plaintiffs have fallen short of establishing a substantial likelihood of success on the merits on their trademark infringement claim. Because Plaintiffs have failed to show a substantial likelihood of success on the first element, the Court does not reach the second.

> 1.    Plaintiffs' Registered Trademarks

The Court begins by addressing Plaintiffs' claim of infringement of their registered trademarks. Which of NI's marks allegedly infringe which of Plaintiffs' marks has been somewhat of a moving target as the case has progressed. Plaintiffs have at various times during this litigation propounded different groupings of "Nerium marks" without always identifying to which marks the label refers. In their final brief to the Court, however, Plaintiffs argue simply that "Nerium owns its registered trademarks," and NI's use of "Nerium International" as a trademark on the Optimera products "infringes Nerium's registered marks." Doc. 146, Pls.' Suppl. Br. 2, 3. For the Court's purposes, then, Plaintiffs' "registered trademarks" consist of the group of registrations Plaintiffs submitted certificates for and which are labeled as Exhibit 3 to the Declaration of Dennis Knocke, which is also referenced in Plaintiffs' final brief to the Court as Plaintiffs' Preliminary Injunction Exhibit 8. *See* Doc. 37, App. 29–40, Decl. of Dennis Knocke, Ex. 3; Doc. 146, Pls.' Suppl. Br. 2 (citing "PX8" when referencing Plaintiffs "registered marks"). Based on this group of registrations, Plaintiffs' registered trademarks generally fall into two categories: (1) trademarks identifying products or entities existing before the relationship with NI began—NeriumDerm, NeriumCS, and Nerium

SkinCare[12]; and (2) trademarks associated with products developed as a result of the relationship with NI—NeriumAD and NeriumFirm.[13] The Court will address each category below.

      i.      *NeriumDerm, NeriumCS, and Nerium SkinCare*

Registration of a trademark is prima facie evidence of the mark's validity and ownership. 15 U.S.C. §§ 1057(b), 1115(a). As noted above, Plaintiffs have registered generic wordmarks and graphic trademarks for NeriumDerm, NeriumCS, and Nerium SkinCare. *See* Doc. 37, App. 29–40, Decl. of Dennis Knocke, Ex. 3. Therefore, Plaintiffs enjoy a presumption of validity and ownership regarding these marks. Such presumption, however, does not "preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a).

In addition to having registered these marks, Plaintiffs have provided declarations of

---

[12]Plaintiffs also provided registration certificates for graphic and generic service marks for Nerium Biotechnology, Inc. *See* Doc. 37, App. 38, 39 (Reg. Nos. 4,464,657 and 4,414,257). Plaintiffs filed the application for the Nerium Biotech graphic service mark, featuring a *Nerium oleander* flower, on August 6, 2012, and it was registered to Plaintiffs on January 14, 2014, with a "first use in commerce" date of July 31, 2011. *Id.* at 38. Plaintiffs later filed an application for the generic service mark of just the words "NERIUM BIOTECHNOLOGY, INC." on February 25, 2013, and it was registered to Plaintiffs on October 8, 2013, with a "first use in commerce" date of June 18, 2008. *Id.* at 39. Neither of these service marks, however, appear to have ever been used on any of the products at issue in this case, nor is there any evidence that they were ever "used in commerce" other than as a trade name for Nerium Biotech. *See* Doc. 36, Pls.' Mot. 2 ("From 2006 to 2009, Nerium Biotech developed the technology for isolating and extracting the components of the *Nerium oleander* plant. . . . Nerium Biotech began using the Nerium Biotechnology, Inc. service mark in this time period, and eventually registered that service mark.").

[13]Plaintiffs also appear to own a registration for a "NERIUMRX" trademark. *See* Doc. 37, App. 33 (Reg. No. 4,768,865). From the certificate it appears that Plaintiffs filed the application to register this mark on October 4, 2010, the same day they applied to register the generic wordmarks "NERIUMDERM," "NERIUMCS," and "NERIUM SKINCARE." *Id.* For whatever reason, the "NERIUMRX" trademark was not registered to Plaintiffs until much later, July 7, 2015, and the registration certificate shows a "first use in commerce" date of April 29, 2015. *Id.* The preliminary injunction record is completely silent, however, on how or if this trademark has ever actually been used in commerce or how it relates to any of the products or trademarks at issue in this case.

continuous use for the NeriumDerm, NeriumCS, and Nerium SkinCare graphic trademarks (Reg. Nos. 3,921,445; 3,921,447; 3,921,446, respectively), indicating both that the marks are presently in use in commerce and that they have been in continuous use for five consecutive years. *See* Pls.' Prelim. Inj. Ex. 116, 117, 118. "[T]he right of the owner to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable." 15 U.S.C. § 1065. To the extent that the right to use a registered mark has become incontestable, the registration shall be "conclusive evidence" of the validity of the registered mark and the registrant's ownership of the mark. *Id.* § 1115(b). Even so-called "incontestable" marks, however, are subject to certain defenses. *Id.* Such defenses include abandonment of the mark by the registrant or that the registrant obtained either the registration or the incontestable right fraudulently. *Id.* § 1115(b)(1), (2). Equitable principles also apply. *Id.* § 1115(b)(9). NI disputes both whether the NeriumDerm, NeriumCS, and Nerium SkinCare marks have been in continuous use for five consecutive years, as well as whether they were ever "used in commerce" at all.

Plaintiffs' motion indicates that "sales in test markets" of the NeriumDerm and NeriumCS products in 2009 and 2010 "was the first use in sale of the Nerium Marks, including Nerium." Doc. 36, Pls.' Mot. 2–3.[14] The Lanham Act defines the term "use in commerce" as "the bona fide use of

---

[14]There is conflicting evidence in the record as to whether the Nerium SkinCare mark was actually present on these early products. The packaging mockups Plaintiffs initially provided do not appear to bear any Nerium SkinCare marks. *See* Doc. 37, App. 22, 26. However, images of both products later submitted with Plaintiffs' preliminary injunction exhibits appear to display the Nerium SkinCare graphic mark on the back of the NeriumDerm and NeriumCS boxes. *See* Pls.' Prelim. Inj. Ex. 118. For purposes of its analysis, the Court assumes the Nerium SkinCare mark was present on the NeriumDerm and NeriumCS products' packaging.

a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. A mark shall be deemed to be used in commerce when (1) "it is placed in any manner on the goods or their containers . . . or on the tags or labels affixed thereto," and (2) "the goods are sold or transported in commerce." *Id.* Plaintiffs' motion indicates NeriumDerm and NeriumCS were available for purchase "online and in San Antonio" in 2009 and 2010. Doc. 36, Pls.' Mot. 2. The attached declaration of Dennis Knocke further states they were "sold in 2009 and 2010 to shareholders and other individuals. In addition the products were available for sale on the www.nerium.com website." Doc. 37, App. 3, Decl. of Dennis Knocke ¶ 11.[15] Both Plaintiffs' motion and Knocke's declaration reference these test sales in the past tense, and neither Plaintiffs' briefing nor Knocke's declaration mention any additional sales of either product after 2009 and 2010. Therefore, at least initially, the Court was left with the impression that all parties agreed that sales of NeriumDerm and NeriumCS ceased after they were "tested" in 2009 and 2010.

Also apparently under this impression, in its June 23, 2016 Answer, NI counterclaimed for cancellation of the NeriumDerm, NeriumCS, and Nerium SkinCare marks based on Plaintiffs' alleged non-use of the marks since before the Company Agreement was signed. Doc. 33, Def.'s Answer ¶¶ 243–46.[16] Additionally, in its response appendix to Plaintiffs' motion, NI included

---

[15]At the November 30, 2016 preliminary injunction hearing, there was testimony from Joe Nestor, current Executive Vice President and former Chief Financial Officer of Nerium Biotech, that the website required a login to access and that there was no "public website" at that time for "public sales." Doc. 152, Nov. 30, 2016 Hr'g Tr. 76:13–21.

[16]*See* 15 U.S.C. § 1127 ("Nonuse for 3 consecutive years shall be prima facie evidence of abandonment."). While Plaintiffs decry that NI did not argue abandonment until its sur-reply and has not met its burden to establish it, Doc. 146, Pls.' Suppl. Br. 3 n.3, the Court need not decide the ultimate issue of abandonment at this stage. Rather, the Court need only consider whether Plaintiffs have met their burden of establishing a substantial likelihood of success on the merits on their trademark claim to warrant the extraordinary equitable relief they seek.

excerpts from discovery responses in which Plaintiffs denied sales of any product "to any entity other than NI from October 25, 2010 to the present." Doc. 56, App. 70–77. While "no sales to an entity" does not necessarily equal "no sales at all," one could understand why the Court was surprised to hear from Plaintiffs' counsel at the November 1, 2016 preliminary injunction hearing that both NeriumDerm and NeriumCS "are still being offered for sale today." Doc. 137, Nov. 1, 2016 Hr'g Tr. 15:17–18. It was also at the November 1 hearing that Plaintiffs first submitted the declarations of continuous use for the NeriumDerm, NeriumCS, and Nerium SkinCare marks. These declarations were signed by Dennis Knocke on March 23, 2016, after the commencement of both the state court lawsuit and the trademark suit filed by Nerium Biotech in the Eastern District of New York. *See* Pls.' Prelim. Inj. Ex. 116, 117, 118.

Later, at the preliminary injunction hearing on November 30, 2016, Mr. Knocke testified that the products continue to be sold "on a very limited basis" in "family- and friends-type sales" for the purpose of "maintain[ing] the trademarks." Doc. 152, Nov. 30, 2016 Hr'g Tr. 99:22–100:5. At this same hearing, NI also elicited testimony from Mr. Nestor indicating that Plaintiffs have never listed NeriumDerm or NeriumCS as marketable products in filings with various governmental securities regulators. Doc. 152, Nov. 30, 2016 Hr'g Tr. 77:18–78:1.

"As long as there is a genuine use of the mark in commerce . . . ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition." *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998). And "even a single use in trade may sustain trademark rights if followed by continuous commercial utilization." *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975). "Sporadic" or "minimal uses" of a mark, however, "may indicate the mere intent to reserve a mark

for later use rather than the present commercial utilization of the mark." *Allard*, 146 F.3d at 359. And "[n]ominal or token sales to personal friends do not constitute a *bona fide* commercial use of a trademark." *Burlington N. Santa Fe Corp. v. Purdy*, No. 98-11485, 1999 WL 1328011, at *1 (5th Cir. Dec. 7, 1999) (citing J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:7 (4th ed. 1997)). "There must be a trade in goods sold under the mark or at least an active and public attempt to establish such a trade." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1274 (2d Cir. 1974). A "mere trickle" of business over a course of years does not constitute "the kind of bona fide use intended to afford a basis for trademark protection." *Id.* at 1272.

The record in this case is spotty at best regarding the use, much less the continuous use, in commerce of the NeriumDerm, NeriumCS, and Nerium SkinCare trademarks. In Plaintiffs' own words, there were only ever "very limited" sales of NeriumDerm and NeriumCS to Nerium Biotech's shareholders for the purpose of "maintain[ing] the trademarks." Doc. 152, Nov. 30, 2016 Hr'g Tr. 99:22–100:5. Even assuming these "test sales" constitute a *bona fide* use in commerce for purposes of trademark protection, the only evidence of any continuing commercial use is Mr. Knocke's testimony and the declarations of continuous use filed after this lawsuit began. This does not appear to be the "continuous commercial utilization" envisioned by the cases on which an early minimal use may hold trademark protection. Therefore, based on this record, the Court does not find that Plaintiffs have established a substantial likelihood of success on the first element of their trademark infringement claim as it relates to the NeriumDerm, NeriumCS, and Nerium SkinCare trademarks.

   *ii.*  *NeriumAD and NeriumFirm*

Next, the Court turns to Plaintiffs claim of infringement of the NeriumAD and NeriumFirm marks, which were developed and first put into use after the relationship with NI began. As Plaintiffs

note in their original motion, "[t]he dispute here is not over the marks' protectability, but the marks' ownership." Doc. 36, Pls. Mot. 9. As with the NeriumDerm, NeriumCS, and Nerium SkinCare marks above, Plaintiffs have registered the NeriumAD and NeriumFirm marks, and thus are entitled to a presumption of the validity and ownership of these marks. This presumption, of course, is rebuttable, and NI has raised several issues regarding Plaintiffs' claim of ownership of these registered marks.

Plaintiffs first argue that the language of the Company Agreement "expressly provides that Plaintiffs own all marks affixed to the Nerium Products," citing to §§ 20.01 (d) (i) (1) and (d) (ii) of the Company Agreement. Doc. 36, Pls.' Mot. 10. Next, "even assuming that the Company Agreement does not establish ownership over the trademarks displayed on the Nerium Product packaging," Plaintiffs contend that as the manufacturer of the NeriumAD and NeriumFirm products, they were necessarily the first to use the trademarks in commerce "when they sold the Products to NI" for distribution. *Id.* at 10–11.

NI, on the other hand, disputes whether the Company Agreement assigns any rights to trademarks not in existence at the time the Company Agreement was signed. Doc. 55, Def.'s Resp. 16. Additionally, NI argues it created the NeriumAD and NeriumFirm marks with little input from Plaintiffs, and that it was actually the first to use these marks in commerce because Plaintiffs' "sale" to NI was not sufficiently public to confer trademark protection. *Id.* at 15, 18.

"Ownership of trademarks is established by use, not by registration." *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 842 (5th Cir. 1990). The first to use a mark is generally held to be the "senior" user and is entitled to enjoin other "junior" users from using the mark or another mark that is deceptively similar to it. *Id.* at 842–43. The concept of

first "use," however, is more complicated when the dispute over trademark ownership is between a manufacturer and its exclusive distributor. *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996); *see also Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 516 F.2d 846, 850 (8th Cir. 1975) (noting that when the issue "is who, as between the manufacturer and distributor, has ownership of a trademark created after the formation of the business relationship . . . the underlying and dispositive question [is] which party has priority of appropriation and use of the trademark in connection with his business").

In manufacturer-distributor disputes, the courts first look to any agreement between the parties. *Controls Int'l, Inc. v. Kinetrol, Ltd.*, No. 3:97-CV-2504-D, 1998 WL 158678, at *5 (N.D. Tex. Mar. 25, 1998) (citing *Sengoku*, 96 F.3d at 1220). In the absence of an agreement between the parties regarding trademark ownership, the manufacturer is presumed to own the trademarks. *Id.* (citing *Sengoku*, 96 F.3d at 1220). This presumption in favor of the manufacturer is rebuttable, however, and a long-standing line of precedent holds that an exclusive distributor may acquire trademark rights superior to those of the manufacturer. *Sengoku*, 96 F.3d at 1220. Courts look to the following five factors to determine whether a distributor can rebut the manufacturer's presumption:

(1) which party invented and first affixed the mark onto the product;

(2) which party's name appeared with the trademark;

(3) which party maintained the quality and uniformity of the product;

(4) with which party the public identified the product and to whom purchasers complained; and

(5) which party the public believes stands behind the product.

*Kinetrol*, 1998 WL 158678, at *5 (citing *Sengoku*, 96 F.3d at 1220). The Court first examines the

- 22 -

language of the Company Agreement.

> a. Section 20.01 of the Company Agreement

Plaintiffs argue the Company Agreement expressly assigns them ownership of all trademarks affixed to "Nerium Products." Doc. 36, Pls.' Mot. 10. For support, Plaintiffs point to § 20.01 of the Company Agreement. *Id.* Section 20.01 encompasses several provisions that touch on trademarks. First, § 20.01(a) provides that "[Plaintiffs] own[ ] . . . all the properties and assets (whether real, personal, or mixed and whether tangible or intangible) that are required for the production and packaging of the Product Line"—the Product Line being that described in Exhibit C of the Agreement, as noted above. Doc. 37, Ex. 5, Company Agreement § 20.01(a). While trademark rights are a form of "intangible" asset, a full reading of § 20.01(a) quickly reveals that this provision does not appear to be referring to trademarks. Rather, it seems to be talking about the physical assets necessary for the actual manufacturing process. *See id.* (stating that Plaintiffs own "sufficient quantities to produce . . . at least 50,000 units monthly of the Product Line" for the first 12 months).

Skipping down to § 20.01(d), titled "Intellectual Property," the Company Agreement defines "Intellectual Property Assets" to include the following: "(1) all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications utilized by [Plaintiffs], or any of [their] affiliates, in the production and packaging of the Product Line (collectively, "Marks")." *Id.* § 20.01(d)(i)(1). In the next sub-section, titled "Know-How Necessary for the Production of the Product Line," the Agreement states that "[Plaintiffs are] the owner[s] of all right, title, and interest in and to each of the Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims, and has the right to use without payment to a third party all of the Intellectual Property Assets." *Id.* § 20.01(d)(ii). The next several

sub-sections break out each form of Intellectual Property Asset for further explanation. *See id.*

§ 20.01(d)(iii)–(vii) (titled "Patents," "Trademarks," "Copyrights," "Trade Secrets," and "Product

Line History"). The sub-section titled "Trademarks" provides the following:

> (1) Concurrently with the execution of this Agreement, [Plaintiffs] will provide [NI] with a complete and accurate list and summary description of all Marks. Nerium is the owner of all right, title, and interest in and to each of the Marks, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.
>
> (2) All Marks that have been registered with the United States Patent and Trademark Office are currently in compliance with all formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable[.]
>
> (3) There is no potentially infringing trademark or trademark application of any third party regarding any of the Marks.

*Id.* § 20.01(d)(iii)(1)–(3). And finally, with regard to NI's use of the Intellectual Property Assets,

§ 20.01(d)(viii) provides that:

> Concurrently with the execution of this Agreement, and in conjunction with the rights of [NI] to market, sell and distribute the Product Line, [Plaintiffs] will grant perpetual licenses to allow [NI] the right to utilize the Intellectual Property Assets, or, to the extent that such rights are held by a third party, insure that such third party grants [NI] such licenses to utilize the Intellectual Property Assets to the extent reasonably necessary for the marketing, distribution and sale of the Product Line.

*Id.* § 20.01(d)(viii).

Plaintiffs contend these provisions, when read in conjunction with the Purposes Clause in

§ 2.05 of the Agreement—which references "products that have been developed, or are in the future

developed" by Plaintiffs—assign ownership over all trademarks in use at the time of the Company

Agreement as well as any trademarks later developed or used in the course of the relationship with

NI. According to Plaintiffs, "[t]he provision is not limited in time, and includes past, present, and

future periods of use." Doc. 36, Pls.' Mot. 10.

For its part, NI hotly disputes that the Company Agreement assigns ownership of any trademarks, much less of all past, present, and future marks. Instead, NI points out that § 20.01 is titled "Representations and Warranties" and begins with the phrase "[Plaintiff] hereby represents and warrants to Olson and [NI] that," after which it goes on to detail the representations and warranties Plaintiffs are making. Doc. 55, Def.'s Resp. 16–17 (citing Doc. 37, Ex. 5, Company Agreement § 20.01). Thus, NI argues, this section of the Company Agreement merely reflects Plaintiffs' representations and warranties about the Intellectual Property Assets owned by Plaintiffs at the time the Company Agreement was executed; but it does not assign any rights to future marks that may be developed in the course of the relationship between the parties going forward. *Id.*

The principal aim in construing a written contract is to discern the true intent of the parties as expressed through the contract's terms. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). In determining the parties' intent, the Court looks to the objective intentions expressed in the contract itself, and construes the contract's terms according to their plain meaning unless the contract itself provides an intended, different meaning. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Heritage Res. v. Nationsbank*, 939 S.W.2d 118, 121 (Tex. 1996). "'Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous and the court will construe it as a matter of law.'" *Orthoflex, Inc., v. ThermoTek, Inc.*, 983 F.3d 866, 872 (5th Cir. 2013) (quoting *Orthoflex, Inc., v. ThermoTek, Inc.* 2013 WL 4045206, at *3 (N.D. Tex. Aug. 9, 2013) (Fitzwater, C.J.). If, however, the meaning of a contractual provision is reasonably susceptible to more than one interpretation, it is ambiguous. *Monsanto Co. v. Boustany*, 73 S.W. 3d 225, 229 (Tex. 2002). Once a contractual provision has been deemed ambiguous as a

matter of law by the court, the court may consider extrinsic evidence to determine its meaning. *DRC Parts & Accessories, L.L.C., v. V.M. Motori, S.P.A.*, 112 S.W.3d 854, 857-58.

Here, at the preliminary injunction stage of this case, and subject to change as the record develops on summary judgment or at trial—perhaps through extrinsic evidence—the Court is not persuaded that the language of the Company Agreement assigns Plaintiffs the expansive trademark rights they now claim over trademarks not in existence at the time the Company Agreement was executed, such as the NeriumAD and NeriumFirm marks. The Court is likewise not persuaded by Plaintiffs' licensing arguments or their reliance on the *Twentieth Century Fox* case, as for NI to be the licensee of the NeriumAD and NeriumFirm marks—or, for that matter, the "N" mark discussed below—Plaintiffs would first have to be found to own those marks, which the Court does not find here based on the Company Agreement.[17] Plaintiffs would have the Court hold that § 20.01 works as a reservation of future rights in all trademarks that would ever be used on Nerium products, which the Court does not find in the Company Agreement's "Representations and Warranties" section. In the absence of an agreement regarding trademark ownership, Plaintiffs fall back to the presumption in favor of the manufacturer. *Sengoku*, 96 F.3d at 1220. Thus, the Court turns to the five factors outlined in *Kinetrol* and *Sengoku* to see whether NI can overcome Plaintiffs' presumption of ownership.

---

[17]This case is not like *Twentieth Century Fox*, where Marvel brought to the relationship an existing X-Men trademark which it licensed to Twentieth Century Fox, who then developed its own variation on that mark. *See generally Twentieth Century Fox Film Corp. v. Marvel Enters.*, 155 F. Supp. 2d (S.D.N.Y. 2001). Here, the marks Plaintiffs allegedly licensed did not even exist until after the relationship began; they were not a variation of a previously owned mark that Plaintiffs brought to the relationship.

      b.     The *Kinetrol/Sengoku* factors

Regarding the first factor, Plaintiffs contend that as the manufacturers of the NeriumAD and NeriumFirm products they "clearly created and affixed the marks to the Nerium Products first." Doc. 36, Pls.' Mot. 12. Defendants, on the other hand, argue Plaintiffs did nothing more than "provid[e] the oleander powder from which an extract was made." Doc. 55, Def.'s Resp. 20. The evidence of record, including the testimony presented at the preliminary injunction hearings, seems to indicate that the development of both the NeriumAD and NeriumFirm trademarks—as well as the NeriumAD and NeriumFirm products themselves and their packaging—was the result of a collaborative process between NI and Plaintiffs. *See, e.g.*, Doc. 56, App. 104–113, Decl. of Amber Rourke; Doc. 56, App. 217–221, Decl. of Amber Rourke, Ex. E; Doc. 152, Nov. 30, 2016 Hr'g Tr. 204:17–210:21, 324:2–327:3; Doc. 153, Dec. 1, 2016 Hr'g Tr. 10:20–12:1, 85:19–89:3. If anything, the evidence suggests that NI may have actually taken the lead, with Plaintiffs relying on and ultimately deferring to NI's marketing expertise. As to who first affixed the marks to the products, it appears this was done either by Plaintiffs or by third-parties contracted by Plaintiffs to manufacture and bottle the products.

Regarding the second factor, it does not appear that either of Plaintiffs' names have ever appeared on NeriumAD or NeriumFirm products. The pre-rebrand NeriumAD night cream, however, featured the name "NERIUM INTERNATIONAL" on the top of the package within a circular logo containing the "N" mark  above the tag-line "REAL SCIENCE - REAL RESULTS." Doc. 153, Dec. 1 2016 Hr'g Tr. 24:21–25:17. Additionally, it is undisputed that "Nerium International" has been listed as the distributor on all NeriumAD and NeriumFirm products both before and after the rebrand. And of course, after the rebrand NI's name has been displayed

prominently on all of Plaintiffs' products.

The third and fourth factors overlap, as do the fourth and fifth. First, regarding who maintains the quality of the product and to whom customers complain, Plaintiffs allege only that they have "at all times[ ] controlled the quality of the Nerium Products" because they have "manufactured the Nerium Products in their own manufacturing facility." Doc. 37, App. 11, Decl. of Dennis Knocke ¶ 39. NI disputes that Plaintiffs have any control over the products' quality because, it argues, Plaintiffs do not actually do any of the manufacturing themselves, but rather they contract it out to third-party formulators and manufacturers. Doc. 55, Def.'s Resp. 20. Also, NI has provided evidence that it maintains two databases for managing customer complaints, one of which is shared with Plaintiffs, as well as that it handles all product returns. Doc. 56, App. 91–92, Decl. of Pilar Duque ¶¶ 4–6; Doc. 153 Dec. 1 2016 Hr'g Tr. 67:17–68:2, 71:23–72:1. Additionally, NI contends it worked directly with Plaintiffs' third-party manufacturers to address quality concerns with the original NeriumAD night cream in 2011, after which NI instituted quality control measures requiring Plaintiffs' third-party manufacturer to provide NI with samples of each batch so that NI can verify the consistency, smell, look, and feel of the product. Doc. 56, App. 85–87, Decl. of Jeff Branch ¶¶ 2–5. In another example, NI indicates that problems with NeriumFirm in early 2016 caused it to implement similar quality control measures with another of Plaintiffs' third-party manufacturers such that the manufacturer may no longer fill orders for the firming cream without NI's authorization. Doc. 56, App. 91–92, Decl. of Pilar Duque ¶ 5.

Finally, with regard to which party the public identifies with the products and which party the public believes stands behind the products, it would be difficult to imagine that the public associates either product with anyone other than NI. Per the Company Agreement, NI is responsible

for all marketing and advertising efforts on behalf of Plaintiffs' products. There was exhaustive testimony at the preliminary injunction hearing about the various websites, blogs, social media platforms, magazines, and public events NI has used to promote Plaintiffs' products. Doc. 153, Dec. 1, 2016 Hr'g Tr. 35:25–45:5. Additionally, Plaintiffs' products can only be purchased from an NI brand partner and have only ever identified NI on the packaging, even if only as the distributor. The Court is not by any means saying that Plaintiffs do not stand behind their products. However, given that neither product has ever identified Plaintiffs as their source—even just as their manufacturer—and that NI apparently receives all customer complaints and processes all customer returns, the Court cannot see how the public would have any reason to know that Plaintiffs stand behind the products.

Weighing these factors, the Court is not convinced that Plaintiffs have demonstrated a likelihood of success with regard to the ownership element of their trademark claim as it relates to the registered NeriumAD and NeriumFirm trademarks.

2.    The "N" Mark

As with the NeriumAD and NeriumFirm marks above, Plaintiffs contend they own the "N" design by virtue of the Company Agreement, and that NI's use of that mark on the Optimera products is a violation of the license granted NI in the Company Agreement. Doc. 146, Pls.' Suppl. Br. 5–6. For its part, NI argues that the Company Agreement does not assign Plaintiffs rights to future trademarks, that NI actually created the "N" mark, and that Plaintiffs have not rebutted NI's registrant's presumption. Doc. 55, Def.'s Resp. 16–17. The trademark analysis for the "N" mark—developed after the relationship with NI began and featured on all Plaintiffs' products ever since the first NeriumAD night cream—is largely identical to that of the NeriumAD and

- 29 -

NeriumFirm marks above and the Court need not rehash it, with one exception. The "N" mark, unlike all of the marks previously discussed, is registered to NI. *See* Doc. 56, App. 116 (Reg. No. 4,469,321). Thus, for the "N" mark the Court begins from the presumption that the mark is protectible and that NI owns it, and Plaintiff has the burden to rebut this presumption. 15 U.S.C. §§ 1057(b), 1115(a). Although Plaintiffs, citing *Sengoku*, contend the "presumption is easily rebutted," the Court is not so easily convinced. Therefore, to summarize, starting from the registrant's presumption in favor of NI, then considering the language of the Company Agreement, moving to the manufacturer's presumption in favor of Plaintiffs, and finally weighing the *Kinetrol/Sengoku* factors the same as with the NeriumAD and NeriumFirm marks above, the Court does not find that Plaintiffs have demonstrated a substantial likelihood of success on the merits on their trademark infringement claim as it relates to the "N" mark, which is currently registered to NI.

## IV.

## CONCLUSION

For the above stated reasons, the Court concludes that Plaintiffs have not established a substantial likelihood of success on the merits with regard to the first element necessary to prove a trademark infringement claim under the Lanham Act. Therefore, Plaintiffs Motion for Preliminary Injunction is **DENIED.** Because Plaintiffs have not demonstrated a likelihood of success on the first element, the Court does not reach the second element and the digits of confusion analysis. Additionally, because Plaintiffs have not shown a substantial likelihood of success on the merits, it is not necessary to address the other elements required for a grant of injunctive relief.

SO ORDERED.

SIGNED: January 16, 2017


_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE